IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PHONES PLUS, INC, Plan Administrator | : | CIVIL ACTION |
| of the Phones Plus Retirement Savings Plan, | : | NO. |
| On Behalf of Itself and All Others Similarly | : | |
| Situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | CLASS ACTION COMPLAINT |
| | : | |
| THE HARTFORD FINANCIAL SERVICES, INC., | : | |
| HARTFORD LIFE INSURANCE COMPANY | : | |
| and NEUBERGER BERMAN MANAGEMENT, | : | |
| INC., | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

Plaintiff, Phones Plus, Inc. ("Plaintiff" or "Phones Plus"), by and through its undersigned

counsel, in support of this Complaint, hereby pleads and avers as follows:

## I.    **INTRODUCTION**

1.    This is an action for equitable relief and damages under the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§1001 *et seq*., in which Plaintiff seeks to recover,

for the benefit of the Plaintiff's 401(k) plan and all other similarly situated retirement plans, also

known as employee pension benefit plans under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A),

payments from mutual funds and/or mutual fund advisors (collectively, "mutual funds") to

Defendants, The Hartford Financial Services, Inc., The Hartford Life Insurance Company or

Neuberger Berman Management, Inc. and any similar payments between Defendants ("the

revenue sharing payments").

2.    Defendants, The Hartford Financial Services, Inc., Hartford Life Insurance

Company and Neuberger Berman Management, Inc., have entered into revenue sharing

agreements and arrangements with various mutual funds, as well as between themselves,

pursuant to which Defendants receive payments for their own benefit in violation of, *inter alia*,

ERISA's prohibited transaction rules, ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and

1106(b), and ERISA's fiduciary rules, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§

1104(a)(1)(A) and (B).

     3.     Plaintiff brings this action on its own behalf and on behalf of all those similarly

situated, under ERISA §§ 409(a) and 502(a)(2) and (g), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and

(g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein;

- Disgorgement and/or restitution of all the revenue sharing payments received by Defendants and/or their subsidiaries and affiliates, or, alternatively, the difference between the revenue sharing payments and the reasonable fair market value of any services provided by Defendants to the mutual funds for which the revenue sharing payments purportedly constituted payment;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

     4.     Plaintiff, Phones Plus, Inc., is the Plan Administrator of the Phones Plus, Inc.

401-K Profit Sharing (the "Phones Plus Plan" or the "Plan"). Phones Plus brings this action on

behalf of the Plan in its capacity as its Trustee. In that capacity, Phones Plus is a fiduciary of the

Plan. Both the Phones Plus Plan and Phones Plus are located at 2745 South Calhoun Road, New

Berlin, Wisconsin 53151.

5.      Defendant, The Hartford Financial Services, Inc. ("HFS"), is a corporation organized under the laws of the State of Delaware, with its principal place of business at Hartford Plaza, Hartford, Connecticut.   HFS is a diversified insurance and financial services company. Directly and/or through its subsidiaries, HFS provides savings and retirement products, including the products of the Hartford Life Insurance Company, to the Plan and other similarly situated 401(k) and retirement plans.  HFS is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   HFS is headquartered in this State and, upon information and belief, transacts business in every State in the United States of America.

6.      Defendant, Hartford Life Insurance Company ("Hartford Life"), is a wholly owned subsidiary of HFS.  Hartford Life is a Connecticut corporation, which also maintains its principal place of business at Hartford Plaza, Hartford, Connecticut.  Hartford Life is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A).   Hartford Life is headquartered in this State and, upon information and belief, transacts business in every State in the United States of America.

7.      Defendant, Neuberger Berman Management, Inc. ("Neuberger"), is a financial service company, incorporated in the State of New York, which maintains its principal place of business at 605 Third Avenue, 2nd Floor, New York, New York.  Neuberger is an investment advisor to the Plan and an ERISA fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   Upon information and belief, Neuberger transacts business in most, if not all, of the States of the United States of America, including the State of Connecticut.

### III.    JURISDICTION AND VENUE

8.    Plaintiff seeks relief on behalf of the Phones Plus Plan and other similarly situated plans and entities (collectively, the "Plans"), pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA § 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1)(2), 29 U.S.C. § 1132(e)(1)(2).

9.    Venue is proper in this judicial district under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and under 28 U.S.C. § 1391, because HFS and Hartford Life (collectively, "The Hartford") are headquartered in this judicial district, a substantial part of the events or omissions giving rise to the claims occurred and/or arose in this judicial district and a substantial part of the challenged conduct occurred in and/or emanated from this judicial district.  In addition, all of the Defendants regularly transact business in this judicial district.

### IV.    BACKGROUND FACTS

#### A.    The Plans

10.    At all pertinent times, the Phones Plus Plan was a 401(k) retirement plan and, as of the date of the filing of this Complaint, it remains a 401(k) retirement plan.  Phones Plus and the Plan participants have funded and continue to fund the Plan.  Under the Phones Plus Plan and through the Plan's contract with The Hartford, participants were entitled to invest in the various mutual funds selected for inclusion as investment options within the Plan by The Hartford and Neuberger.

11.    Plaintiff is informed and believes that at least thousands of qualified ERISA retirement plans are members of the Class, as defined below, who contracted with one or more of

the Defendants to provide services with respect to the investment of these Plans' assets during the Class Period.

**B.    The Relationship Between Class Members, The Hartford, Neuberger And The Mutual Funds**

12.    The employers who are the sponsors of the Plans that compose the Class engage full-service providers, such as The Hartford, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative services necessary to operate them.  Agents of The Hartford solicit business on behalf of The Hartford on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for The Hartford receive commissions for obtaining such business for The Hartford. In addition, agents of The Hartford request and effectively direct plans that they are soliciting to select Neuberger (or similar entities) as their investment advisor, and agents for The Hartford receive additional commissions for accomplishing this objective of The Hartford.

13.    In promoting its services, The Hartford trumpets the "investment choices" that it offers on the basis that they "span the risk/return spectrum," as well as "its experienced people, ... well-designed program... and over 170 highly qualified retirement professionals...." In addition, despite claims that it only serves as a "provider" in an attempt to disclaim fiduciary responsibility despite its clear fiduciary duties, The Hartford's own literature recognizes the true nature of its role and fiduciary capacity by promoting The Hartford's ranking as "Top Plan Administrator" and "Top Fund Manager" in the "$1 to $10 million market" according to "IOMA's *Managing 401K Plans* (December, 2002)."

14.    After setting up a qualified ERISA retirement plan such as the Phones Plus Plan,

The Hartford provides all of the services necessary for such plans to operate, including record-keeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administration, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

### 1.    The Hartford Contracts

15.    The Hartford enters into two standard form contracts with ERISA retirement plans:  an Administrative Services Agreement and a Group Annuity Contract.

16.    The standard form Administrative Services Agreement pertains to accounting for contributions to the Group Annuity Contract (which creates a self-described "funding vehicle for retirement plans"), benefit payments from the Group Annuity Contract, the withholding of taxes from such benefit payments, and tax reporting to participants, annuitants, and government agencies.  Pursuant to the standard form Administrative Service Agreement, the Phones Plus Plan and other similarly situated plans entrust The Hartford with contributions to these plans so that The Hartford can properly allocate the participant contributions.

17.    Under the Group Annuity Contracts, The Hartford provided and continues to provide investment options to the Phones Plus Plan and other similarly situated plans through insurance products called group variable annuities.

18.    The Group Annuity Contracts provided and provide for payment by the Phones Plus Plan and other similarly situated plans to The Hartford of separate account fees (the "Mortality and Expense Risk Charges"), which are calculated as a percentage of the daily value of a given plan's investment in the variable account in which The Hartford held the shares of the

underlying mutual funds, and for payments of brokerage commissions, transfer taxes and any expenses incurred by The Hartford which it determines are reasonably necessary to preserve or enhance the value of the assets in the sub-accounts representing these plans' ERISA qualified retirement investments.

19.     The Group Annuity Contracts do not disclose that The Hartford will receive any other benefits for the services provided to the Plans.  None of the Group Annuity Contracts (which are standard forms) entered into by The Hartford with the Phones Plus Plan and other similarly situated plans disclose that payments will be made by mutual funds or investment advisors to The Hartford.

20.     In return for the fees and other amounts charged to the Plan and other similarly situated plans, The Hartford selects a menu of mutual funds available for investment by these plans with Group Annuity Contracts.  The Hartford then engages Neuberger and other investment advisors, who annually review the investment options available to participants in these plans, purportedly for the purpose and to ensure that the investment options comprise a wide array of asset classes and money managers that can be used to build a well-diversified retirement program for 401(k) participants.  Neuberger, other investment advisors similarly selected by The Hartford or the ERISA retirement plans themselves (if these plans choose not to engage Neuberger or a similar investment advisor) select a subset of the funds contained in the menu of funds created by The Hartford as investment options for the retirement plan participants.

21.     The Hartford periodically reviews the menu of investment options available to the Plans for which it serves as administrator for the alleged purpose of evaluating style shifts and below-average performance.  If either criterion is lacking for a significant period of time, The

Hartford states that it will consider removing the investment option from the given plan's menu of available investment choices and may recommend removal of the investment option from the existing plan's portfolio of investments. The Hartford can, in its discretion, offer additional funds to the participants of the Plans for which it serves as an administrator with different investment objectives and The Hartford has the discretion to substitute the shares of any registered investment company for the shares of any fund. In addition, The Hartford can, in its discretion, decide that a mutual fund is no longer commercially viable or feasible as an investment alternative, and unilaterally eliminate it from the investment options and/or investment portfolio of the Plans for which it serves as the administrator.

### 2.    The Neuberger Investment Advisory Contracts

22.    As part of the services that it provides to the Phones Plus Plan and other similarly situated ERISA retirement plans, The Hartford offers certain of the Plans for which it serves as an administrator the option of engaging Neuberger as an investment advisor to review these plans' needs annually and to select a specific group of investment choices to be offered to plan participants. Neuberger also is engaged as an investment advisor by other of the Plans pursuant to substantially similar recommendations by other administrators that serve in capacities similar to that occupied by The Hartford *vis-a-vis* the Phones Plus Plan. Pursuant to these engagements, Neuberger reviews and evaluates mutual funds, collective funds, fixed accounts and other investment vehicles offered to the Plans for which it serves as an investment advisor. Neuberger ostensibly charges the Phones Plus Plan only four hundred dollars ($400) per year for these investment advisory services and ostensibly charges other Plans for which it serves as an investment advisor similar fees. Under the Neuberger advisory agreement with The Hartford,

-8-

The Hartford is authorized to automatically deduct the Neuberger annual fees from the Plan's assets under the terms of the Variable Annuity Contract.  Upon information and belief, pursuant to similar advisory agreements, Neuberger's annual fees are deducted by other ERISA retirement plan administrators from the assets of those plans.  In its literature, although its attempts to disclaim its own fiduciary status, The Hartford expressly acknowledges the fiduciary status of Neuberger.

23.     Pursuant to undisclosed agreements with The Hartford and other similar plan administrators, Neuberger also receives additional payment from mutual funds pursuant to revenue sharing agreements designed to compensate Neuberger for recommending these mutual funds as investment options to beneficiaries of the Plans for which Neuberger serves as an investment advisor.  In addition, upon information and belief, Neuberger has entered into revenue sharing arrangements with The Hartford and other similarly situated plan administrators to compensate them for recommending Neuberger as an investment advisor to the Plan and similarly situated retirement plans.

24.     The Phones Plus Plan and other members of the Class have engaged and continue to engage Neuberger as a plan fiduciary investment advisor.

### 3.     **The Mutual Funds**

25.     Pursuant to its contracts with the Phone Plus Plan and other similarly situated ERISA retirement plans, The Hartford has the discretion to unilaterally cease offering mutual funds selected by participants and substitute other mutual funds selected by The Hartford in their place, and The Hartford has made such substitutions.

26.     From a technical perspective, the Plans and their participants do not invest directly

in the mutual funds.  Rather, the Plans and their participants invest in "variable accounts" and other "separate accounts" established by The Hartford and other plan administrators.  The variable accounts established by The Hartford keep the assets separate from the general assets of The Hartford, and the variable accounts are not chargeable with any of The Hartford's liabilities outside of the variable accounts.

27.     The variable accounts maintained by The Hartford are divided into sub-accounts that correspond to the mutual funds and other investment options available under the annuity contracts that The Hartford maintains with the Plans for which it serves as an administrator.  Pursuant to such contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and The Hartford, as well as other plan administrators, allocate those contributions to particular sub-accounts within the variable accounts that correspond to the chosen mutual funds.   In return for the contributions, which are assets of these ERISA qualified plans, the Plans for which The Hartford serves as an administrator and their participants receive accumulation units (shares) in the applicable sub-accounts of the variable accounts, which accumulation units are held by The Hartford.

28.     The accumulation units owned by the Plans and their participants and held by The Hartford constitute plan assets.  Based on the combined contributions to the sub-accounts made by all these Plans and their participants, The Hartford sells and purchases mutual fund shares to hold in the variable accounts.  The value of a plan's accumulation units (shares) in the variable account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

29.     Mutual funds contract with various entities to perform managerial, administrative,

-10-

accounting, legal and other services.  Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees or 12b-1 fees.  Investors thereby effectively pay fees to the investment manager/mutual fund advisor for these and other services.  The mutual funds determine these fees, based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing the net asset value of all of the shares to decrease by the proportionate percentage attributable to these shares.  As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by The Hartford in a variable account decrease by a corresponding percentage, which, in turn, reduces the value of each Plan's and participant's accumulation of units held in The Hartford variable account.

30.     At all relevant times, the mutual funds offered by The Hartford to the Plans for which it serves as an administrator, virtually without exception, have not been the same mutual funds offered to individual investors.  Rather, these mutual funds have been either "clone" funds created by the mutual fund companies for investment by 401(k) plans investing through variable annuity contracts that imitate funds the same mutual fund companies offer to the general public or funds created specifically for investment by 401(k) plans investing through variable annuity and similar contracts that do not mimic funds offered to the general public by the same mutual fund companies.  Certain of these funds have been owned and/or operated by The Hartford itself or its subsidiaries or affiliates.

31.     The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and

the amount of the revenue sharing payments that they have agreed to make to The Hartford and/or Neuberger.

**C.**     **The Revenue Sharing Scheme**

32.     The Hartford and Neuberger both hold themselves out to Plaintiff, the Class and the public as experts in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies and making investment recommendations.

33.     At all pertinent times, The Hartford and Neuberger implemented and participated in a scheme whereby mutual funds made revenue sharing payments to them based upon a percentage of the Plans' assets invested in these mutual funds, respectively, by and through The Hartford and Neuberger.  The Hartford and Neuberger implicitly and/or explicitly made it a condition to offering a mutual fund family's funds to the Plans that the mutual fund family pay them revenue sharing on a majority or all of the funds offered and/or recommended by Defendants.  In addition, upon information and belief, Neuberger made similar revenue sharing payments to The Hartford and other similarly situated plan administrators to compensate them for recommending Neuberger.

34.     To implement this scheme, Defendants initiated changes to their contract pricing to account for revenue sharing arrangements and negotiated revenue sharing agreements with mutual funds and between themselves.

35.     Upon information and belief, revenue sharing payments are made to Defendants pursuant to written contracts ("revenue sharing contracts"), often referred to as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer

-12-

contracts, and these contracts are often entered into by and between Defendants and the investment management firms that provide management and other services to mutual funds. These revenue sharing payments may be in the form of 12b-1 fees (which are supposed to be fees for marketing of the fund), administration fees, service fees, sub-transfer agent fees and/or similar fees. All of the revenue sharing payments are based, in whole or in part, on a percentage of a given plan's investment in a mutual fund and/or based on the magnitude of the investments by the plan in the mutual fund.

36.    While the revenue sharing payments are often described in revenue sharing contracts as reimbursements for expenses incurred in providing services to the mutual funds, those services by which mutual funds may incidentally benefit are actually ones that Defendants had historically provided to the Plans as a necessary part of its business in return for the fees directly collected by Defendants, and these fees did not change as a result of revenue sharing or based upon the percentage or the magnitude of a plan's investments in the mutual fund. Although subsequent to the creation of the Plan, Defendants attempted to foreclose liability for their misconduct by attempting to obtain the unwitting consent of Plaintiff and other Class members to certain of the revenue sharing payments at issue, Defendants' attempt to foreclose such liability fails on its face because (a) the payments at issue are *per se* unlawful and cannot be excused by alleged, subsequent disclosure or purported consent; and (b) Defendants' alleged disclosure itself was false and misleading on its face, as it falsely asserted that revenue sharing payments related to administrative services and did not in any way relate to investment advisory services or to Defendants' recommendation of mutual funds or investment advisors to the Plans.

37.     The revenue sharing payments are generally calculated based upon a percentage of the Plans' assets invested in the mutual funds by and through Defendants. These amounts are not based on the cost of providing the services or a reasonable fair market value for Defendants' services. Typically, the fees for Defendants' services would be provided on an annual per participant basis and not on a percentage of assets or revenue sharing basis. Furthermore, the reasonable fair market price of Defendants' services would be significantly less than the amounts of the revenue sharing payments received by Defendants.

38.     At all pertinent times, Defendants (and/or their subsidiaries or affiliates) have been arranging for, receiving and keeping the revenue sharing payments for their own use and benefit in breach of their fiduciary duties under ERISA. These revenue sharing payments range from twenty-five (25) basis points of the total assets of the Plans for each year during the Class Period to substantially greater revenue sharing payments.

39.     Under all of the circumstances, the revenue sharing payments received by Defendants constituted excessive fees and otherwise violated ERISA.

V.   **CLASS ACTION ALLEGATIONS**

40.     This action is brought as a class action by Plaintiff on behalf of itself and the following proposed class ("Class" or "Plans"):

> All employee pension benefit plans covered by ERISA for which any of the Defendants have received revenue sharing or similar payments from mutual funds or investment advisors based on the percentage or magnitude of the assets of the employee pension benefit plans invested in the mutual funds or similar investment vehicles.
>
> Excluded from the Class are Defendants, any employee pension benefit plans for which Defendants' directors, officers or

employees are beneficiaries and any employee pension benefit
plans for which the Judge to whom this case is assigned or any
other judicial officer having responsibility for this case is a
beneficiary.

41.     This action may be maintained as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

42.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of

Class members throughout the United States.  As a result, the members of the Class are so

numerous that their individual joinder in this action is impracticable.

43.     **Commonality**.  There are numerous questions of fact and/or law that are common

to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)     whether Defendants acted and continue to act as fiduciaries under ERISA

in connection with the conduct described herein;

(b)     whether Defendants breached their fiduciary duties under ERISA by

failing to defray the reasonable expenses of administering the Plans;

(c)     whether Defendants engaged in prohibited transactions by receiving the

revenue sharing payments for their own benefit and otherwise charging excessive fees for the

administrative and investment services they provided to the Plans;

(d)     whether Defendants failed to disclose or inform the Plans of the existence

and true nature of the revenue sharing payments, as well as the excessive fees, received by

Defendants; and

(e)     whether and what form of relief should be afforded to Plaintiff and the

Class.

-15-

44.    **Typicality**.  Plaintiff, who is a member of the Class, has claims that are typical of all the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

45.    **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

46.    **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which do not bar certification.

47.    **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of many Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties and potentially could lead to inconsistent results that would be contrary to the interests of justice.

48.    **Manageability**.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis while the allocation and distribution of damages to Class members would be essentially a ministerial function.

49.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the revenue sharing scheme described above, which scheme Defendants clearly intend to continue to perpetrate in the future.  Accordingly, injunctive relief and equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

**COUNT I**
**(For Breach Of Fiduciary Duty)**

50.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

51.    Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), based on their authority and/or control with respect to the management and/or disposition of the Plans and their assets, as well as their provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendants' authority and responsibility with respect to the administration of the Plans.  Defendants control the selection of the mutual funds available as investment options for the Plans and participants; provide investment advice for compensation with respect to these investment options; use their custody and control of accumulated units of assets of the Plans to obtain revenue sharing payments from the mutual funds; and/or hold accumulated units for the benefit of the Plans,

cancel them to pay their fees, transfer them to use as collateral for loans, cancel them to pay

loans, cancel them to purchase annuities, and cancel them to make cash payments. As

fiduciaries, Defendants are prohibited from receiving benefits in connection with their control or

exercise of authority over the Plans not specifically agreed to by the Plans or their participants in

their contracts with Defendants.

52.     The revenue sharing payments made by the mutual fund companies to Defendants

constitute plan assets because: (a) Defendants received the payments as a result of their fiduciary

status or function (e.g., because Defendants receive payments from mutual funds in exchange for

offering and/or recommending the funds as an investment option to the Plans and their

participants); (b) the mutual funds make payments to Defendants at the expense of the Plans and

participants (e.g., because the mutual funds set the fees they charge Plans and participants to

cover not only the fees they would normally charge but also the amount of the revenue-sharing

payments they have to make to Defendants); and/or (c) revenue-sharing payments effectively

constitute the proceeds of the Plans' and participants' investments.

53.     Defendants are, therefore, fiduciaries under ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(a), with respect to the revenue sharing payments, because they control or exercise

authority respecting the management or disposition of these payments by arranging for, accepting

and retaining them either directly or through their subsidiaries or affiliates.

54.     Defendants' arranging for and retention (or the retention by their affiliates or

subsidiaries) of the revenue sharing payments, as set forth above, violate their fiduciary duties

under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Defendants

have failed and continue to fail to discharge their duties with respect to the Plans solely in the

interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

55.   Defendants, individually and jointly, breached their fiduciary duties, by using the possession of, control over or influence with respect to accumulation units to generate the revenue-sharing payments for their own benefit.   Defendants did not use the accumulation units for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent person.  As to the revenue sharing payments themselves, to the extent they constitute Plan assets, Defendants fail to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.

56.   As a direct result of Defendants' breaches of duties, Plaintiff and the Class have suffered losses and damages.

57.   Pursuant to ERISA § 408, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are liable to restore to the Plans the losses they have suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for any other available equitable relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (For Breach of Fiduciary Duty and Violation of ERISA's Prohibited Transaction Rules)

58.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

59.     Defendants have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in their own interest or for their own account.

60.     Defendants' receipt and retention (or the receipt and/or retention by Defendants' affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by Defendants amounts to and constitutes a fiduciary receiving consideration (the revenue sharing payments) for their own personal account from parties (mutual funds) dealing with the Plans in connection with transactions (the so-called service and similar contracts) involving the assets of the Plans (the shares of the variable accounts, represented by the accumulation units).  Specifically, the mutual funds deal with the Plans by accepting funds from separate accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans -- the accumulation units.

61.     Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to the Plans to disgorge and/or make restitution of all revenue sharing payments received by them and their subsidiaries or affiliates; or, alternatively, Defendants are liable to the Plans and the Class to make restitution to the Plans in an amount representing the

difference between the revenue sharing payments and the reasonable fair market value of any services provided by Defendants to the mutual funds for which the revenue sharing payments purportedly constituted payment, and Plaintiff and the Class are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

62.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Class seeks an order declaring that the above-described practices of Defendants in connection with the revenue sharing payments violate ERISA, as set forth above, and seeks a permanent injunction preventing Defendants from engaging in such conduct in the future.

### COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

63.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

64.    Upon information and belief, HFS controlled and directed Hartford Life in engaging in the above conduct.  As a consequence, HFS is a fiduciary of the Plans in connection with the revenue sharing payments in the same manner and to the same extent as is Hartford Life. HFS violated its ERISA § 404 duties owed to the Plans and engaged in transactions prohibited by ERISA § 406.  Consequently, HFS is liable pursuant to ERISA §§ 409 and 502(a)(2) and (3) to the Plans in exactly the same manner and respect as Hartford Life, and the Plans are entitled to recover the exact same relief from HFS and Hartford Life on a joint and several basis.

65.    In the alternative, pursuant to ERISA § 405(a)(1), (2) and (3), 29 U.S.C. § 1105(a)(1), (2) and (3), HFS is jointly and severally liable to the Plans as a co-fiduciary for Hartford Life's breaches of fiduciary duty set forth above.

66.     In the alternative, to the extent that any of the Defendants are not deemed fiduciaries or co-fiduciaries under ERISA, each of the Defendants is liable to the Class for all recoverable damages and relief as non-fiduciaries that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment against Defendants, The Hartford Financial Services Inc., Hartford Life Insurance Company, and Neuberger Berman Management, Inc., jointly and severally, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as detailed above;

(b)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: November 14, 2006

Respectfully submitted,

James E. Miller
Federal Bar I.D. No. CT-21560
Patrick A. Klingman
Federal Bar I.D. No. CT-17813
Karen M. Leser
Federal Bar I.D. No. CT-23587
Shepherd Finkelman Miller & Shah, LLC
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120

Douglas P. Dehler
Shepherd Finkelman Miller & Shah, LLC
111 E. Wisconsin Avenue, Suite 1750
Milwaukee, WI 53202
Telephone: (414) 226-9900
Facsimile: (414) 226-9905

Attorneys for Plaintiff and the Proposed Class

-23-