IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PHONES PLUS, INC, Plan Administrator | : | CIVIL ACTION |
| of the Phones Plus Retirement Savings Plan, | : | NO. 3:06-CV-1835 (AVC) |
| On Behalf of Itself and All Others Similarly | : | |
| Situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | AMENDED CLASS ACTION |
| | : | COMPLAINT |
| THE HARTFORD FINANCIAL SERVICES | : | |
| GROUP, INC., HARTFORD LIFE INSURANCE | : | |
| COMPANY and NEUBERGER BERMAN | : | JURY TRIAL DEMANDED |
| MANAGEMENT, INC., | : | |
| | : | |
| Defendants. | : | MARCH 5, 2007 |

Plaintiff, Phones Plus, Inc. ("Plaintiff" or "Phones Plus"), by and through its undersigned

counsel, in support of this Complaint, hereby pleads and avers as follows:

## I.   INTRODUCTION

1.       This is an action for equitable relief and damages under the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§1001 *et seq*., in which Plaintiff seeks to recover,

for the benefit of the Plaintiff's 401(k) plan and all other similarly situated retirement plans, also

known as employee pension benefit plans under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A),

payments from mutual funds and/or mutual fund advisors (collectively, "mutual funds") to

Defendants, The Hartford Financial Services Group, Inc. and Hartford Life Insurance Company

("the revenue sharing payments").

2.       Defendants, The Hartford Financial Services Group, Inc. and Hartford Life

Insurance Company, as well as their subsidiaries and affiliates, have entered into revenue sharing

agreements and arrangements with various mutual funds, as well as between themselves,

pursuant to which these Defendants receive payments for their own benefit in violation of, *inter alia*, ERISA's prohibited transaction rules, ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and 1106(b), and ERISA's fiduciary rules, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

3.      As explained below, at all pertinent times, Defendant, Neuberger Berman Management, Inc., acted as a fiduciary of Plaintiff and other similarly situated retirement plans and, as a result of its acts, omissions and breaches of fiduciary duty, Neuberger Berman Management, Inc. is legally responsible for the losses suffered by Plaintiff and similarly situated retirement plans, which are the subject of this action.

4.      Plaintiff brings this action on its own behalf and on behalf of all those similarly situated, under ERISA §§ 409(a) and 502(a)(2) and (g), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein;

- Disgorgement and/or restitution of all the revenue sharing payments received by Defendants and/or their subsidiaries and affiliates, or, alternatively, the difference between the revenue sharing payments and the reasonable fair market value of any services provided by Defendants to the mutual funds for which the revenue sharing payments purportedly constituted payment;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

5.      Plaintiff, Phones Plus, Inc., is the Plan Administrator of the Phones Plus, Inc. 401-K Profit Sharing Plan (the "Phones Plus Plan" or the "Plan").  Phones Plus brings this action on behalf of the Plan in its capacity as its Trustee.  In that capacity, Phones Plus is a fiduciary of the  Plan.  Both the Phones Plus Plan and Phones Plus are located at 2745 South Calhoun Road, New Berlin, Wisconsin 53151.

6.      Defendant, The Hartford Financial Services Group, Inc. ("HFS"), is a corporation organized under the laws of the State of Delaware, with its principal place of business at Hartford Plaza, Hartford, Connecticut.   HFS is a diversified insurance and financial services company. Directly and/or through its subsidiaries and affiliates, HFS provides savings and retirement products, including the products of the Hartford Life Insurance Company, to the Plan and other similarly situated 401(k) and retirement plans.  HFS is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   HFS is headquartered in this State and, upon information and belief, transacts business in every State in the United States of America.

7.      Defendant, Hartford Life Insurance Company ("Hartford Life"), is a wholly owned subsidiary of HFS.  Hartford Life is a Connecticut corporation, which also maintains its principal place of business at Hartford Plaza, Hartford, Connecticut.  Hartford Life is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   Hartford Life is headquartered in this State and, upon information and belief, transacts business in every State in the United States of America.

8.      Defendant, Neuberger Berman Management, Inc. ("Neuberger"), is a financial service company, incorporated in the State of New York, which maintains its principal place of

business at 605 Third Avenue, 2nd Floor, New York, New York.  Neuberger is an investment

advisor to the Plan and an ERISA fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A).   Upon information and belief, Neuberger transacts business in most, if not all, of

the States of the United States of America, including the State of Connecticut.

### III.    JURISDICTION AND VENUE

9.    Plaintiff seeks relief on behalf of the Phones Plus Plan and other similarly situated

plans and entities (collectively, the "Plans"), pursuant to ERISA's civil enforcement remedies

with respect to fiduciaries and other interested parties and, specifically, under ERISA § 409, 29

U.S.C. § 1109, and 29 U.S.C. § 1132.  This Court has jurisdiction over this action pursuant to 28

U.S.C. § 1331 and ERISA § 502(e)(1)(2), 29 U.S.C. § 1132(e)(1)(2).

10.    Venue is proper in this judicial district under ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2) and under 28 U.S.C. § 1391, because HFS and Hartford Life (collectively and

including their subsidiaries and affiliates, "The Hartford") are headquartered in this judicial

district, a substantial part of the events or omissions giving rise to the claims occurred and/or

arose in this judicial district and a substantial part of the challenged conduct occurred in and/or

emanated from this judicial district.  In addition, all of the Defendants regularly transact business

in this judicial district.

### IV.    BACKGROUND FACTS

#### A.    The Plans

11.    At all pertinent times, the Phones Plus Plan was a 401(k) retirement plan and, as

of the date of the filing of this Complaint, it remains a 401(k) retirement plan.  Phones Plus and

the Plan participants have funded and continue to fund the Plan.  Under the Phones Plus Plan and

through the Plan's contract with The Hartford, participants were entitled to invest in the various mutual funds selected for inclusion as investment options within the Plan by The Hartford and Neuberger.

12.     Plaintiff is informed and believes that at least thousands of qualified ERISA retirement plans are members of the Class, as defined below, who contracted with Defendants to provide services with respect to the investment of these Plans' assets during the Class Period.

**B.     The Relationship Between Class Members, The Hartford, Neuberger And The Mutual Funds**

13.     The employers who are the sponsors of the Plans that compose the Class engage full-service providers, such as The Hartford, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative and other services necessary to operate them.  Agents of The Hartford solicit business on its behalf on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for The Hartford receive commissions for obtaining such business for The Hartford.  In addition, agents of The Hartford request and effectively direct plans that they are soliciting to select Neuberger (or similar entities) as their investment advisor.

14.     In promoting its services, The Hartford trumpets the "investment choices" that it offers on the basis that they "span the risk/return spectrum," as well as "its experienced people,  . . . well-designed program . . . and over 170 highly qualified retirement professionals...."  In addition, despite claims that it only serves as a "provider" in an attempt to disclaim fiduciary responsibility despite its clear fiduciary duties, The Hartford's own literature recognizes the true nature of its role and fiduciary capacity by promoting The Hartford's ranking as "Top Plan

Administrator" and "Top Fund Manager" in the "$1 to $10 million market" according to "IOMA's *Managing 401K Plans* (December 2002)," and quotes a client as stating: "I wouldn't change a thing with The Hartford [and] [t]hey cover everything."

15.    After setting up a qualified ERISA retirement plan such as the Phones Plus Plan, The Hartford provides all of the services necessary for such plans to operate, including record-keeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administration, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

### 1.    The Hartford Contracts

16.    The Hartford enters into two standard form contracts with ERISA retirement plans:  an Administrative Services Agreement and a Group Annuity Contract.

17.    The standard form Administrative Services Agreement pertains to accounting for contributions to the Group Annuity Contract (which creates a self-described "funding vehicle for retirement plans"), benefit payments from the Group Annuity Contract, the withholding of taxes from such benefit payments, and tax reporting to participants, annuitants, and government agencies.  Pursuant to the standard form Administrative Service Agreement, the Phones Plus Plan and other similarly situated plans entrust The Hartford with contributions to these plans so that The Hartford can properly allocate the participant contributions.

18.    Under the Group Annuity Contracts, The Hartford provided and continues to provide investment options to the Phones Plus Plan and other similarly situated plans through insurance products called group variable annuities.

19.     The Group Annuity Contracts provided and provide for payment by the Phones Plus Plan and other similarly situated plans to The Hartford of separate account fees (the "Mortality and Expense Risk Charges"), which are calculated as a percentage of the daily value of a given plan's investment in the variable account in which The Hartford held the shares of the underlying mutual funds, and for payments of brokerage commissions, transfer taxes and any expenses incurred by The Hartford, which The Hartford determines are reasonably necessary to preserve or enhance the value of the assets in the sub-accounts representing these plans' ERISA qualified retirement investments.

20.     The Group Annuity Contracts do not disclose that The Hartford will receive any other benefits for the services provided to the Plans.  None of the Group Annuity Contracts (which are standard forms) entered into by The Hartford with the Phones Plus Plan and other similarly situated plans disclose that revenue sharing payments will be made by mutual funds or investment advisors to The Hartford.

21.     In a document entitled Plan Sponsor Submission Information, which references the Administrative Service Agreement and the Group Annuity Contract, as well as in subsequent statements, The Hartford has attempted to insulate itself from liability for its misconduct by representing that it receives fees "for administrative and other services" from "many, but not all, of the underlying [mutual] funds that are offered as variable investment choices through the Group Variable Annuity Contract."  The Hartford, however, has explicitly characterized these fees at the time that it made such representations as constituting payments for the following services: "recordkeeping, accounting, and the mailing of periodic reports, fund prospectuses and proxy materials, processing of purchase and redemption transactions, and marketing assistance

services" and falsely asserted that "[t]hese fees do not constitute compensation for investment advisory services."  The Hartford's attempt to foreclose its liability through such disclosures fails on its face because (a) the payments at issue are *per se* unlawful and cannot be excused by alleged disclosure or purported consent; and (b) Defendants' alleged disclosures themselves were false and misleading on their face, since The Hartford falsely represented and asserted that the revenue sharing payments related to administrative services and did not in any way relate to investment advisory services or to Defendants' recommendation of mutual funds or investment advisors to the Plans.

22.     In fact, upon information and belief, in direct response to this lawsuit, in early 2007, in a vain effort to foreclose continuing liability for its misconduct, The Hartford issued the following statement and made the following admissions with respect to its receipt of revenue sharing payments:

> We want you to know that Hartford [Hartford Life Insurance Company and its affiliates] receives substantial fees and payments with respect to the underlying funds that are offered as Sub-Accounts to your Plan through the Contract.  We consider these fees and payments, among a number of other factors, when deciding to include a fund to the menu of Funds that we offer through the Contract.  These fees and payments are received by Hartford under agreements between Hartford and the principal underwriters, transfer agents, investment advisers and/or other entities related to the Funds in amounts up to 1.30% of assets invested in a Fund.  These fees and payments may include asset based sales compensation and service fees under distribution and/or servicing plans adopted by funds pursuant to Rule 12b-1 under the Investment Company Act of 1940.  They may also include administrative service fees and additional payments, expense reimbursement and compensation ***sometimes referred to as "revenue sharing" payments***.  Hartford receives these fees and payments for its own account and expects to make a profit on the amount of the fees and payments that exceed Hartford's own expenses, including our expenses of paying compensation to broker-dealers, financial institutions and other persons for selling the Contracts.
>
> We also want you to understand that not all fund families pay the same amount of

fees and compensation to us and not all funds pay according to the same formula. Because of this, the amount of fees and payments received by Hartford varies by fund and Hartford may receive greater or less fees and payments depending on which variable investment options your Plan selects.

*          *          *

You should know that the principal underwriters of certain funds have chosen to offer for sale, and Hartford has selected, fund share classes with asset based sales charges and/or service fees that may or may not be higher than other available share classes of the same fund.  As a result of any higher asset based fees and charges paid by investors in such share classes, the amount of fees and payments that might otherwise need to be paid by such fund principal underwriters or their affiliates to Hartford would decrease.

Some of the Sub-Accounts available in the Contract invest in Funds that are part of our own affiliated family of funds.  In addition to any fees and payments Hartford may receive with respect to those funds, one or more of our affiliates receives compensation from the funds, including among other things a management fee and 12b-1 fees from the funds.  (Emphasis added.)

23.     This belated admission regarding The Hartford's receipt and profit from revenue sharing payments, in addition to confirming that The Hartford's past representations regarding the nature of the fees that it receives from mutual funds were false and misleading when issued, is of little or no consequence since (a) the payments at issue are *per se* unlawful and cannot be excused by alleged disclosure or purported consent; and (b) The Hartford's new statements on the subject themselves are false and misleading on their face, since The Hartford (1) falsely seeks to characterize the revenue sharing payments as having been previously and fully disclosed by referring the Plans to their "Contracts" for more information even though The Hartford's "Contracts" and related disclosures contain false and misleading statements with respect to the quantum, nature, character and purpose of the revenue sharing payments at issue (which are directly at odds with The Hartford's new, post-litigation statements on the subject); (2) continues

to misrepresent and attempts to minimize the amount of revenue sharing payments received and the nature of such payments; and (3) upon information and belief, falsely implies that the revenue sharing payments are diminished or decrease when The Hartford selects mutual fund share classes with higher asset based sales charges.  Of course, The Hartford's recent statement and partial admissions regarding revenue sharing payments also fail to advise the Plans of the pendency of this litigation, the fact that the statement was issued in response to the filing of this action and/or that it is the position of Plaintiff that The Hartford's receipt of the revenue sharing payments is unlawful.

24.    In return for the fees and other amounts charged to the Plan and other similarly situated plans, The Hartford selects a menu of mutual funds available for investment by these plans with Group Annuity Contracts.  The Hartford then engages Neuberger and other investment advisors, who annually review the investment options available to participants in these plans, purportedly for the purpose and to ensure that the investment options comprise a wide array of asset classes and money managers that can be used to build a well-diversified retirement program for 401(k) participants.  Neuberger, other investment advisors similarly selected by The Hartford, or the ERISA retirement plans themselves (if these plans choose not to engage Neuberger or a similar investment advisor) select a subset of the funds contained in the menu of funds created by The Hartford as investment options for the retirement plan participants.

25.    The Hartford periodically reviews the menu of investment options available to the Plans for which it serves as administrator for the alleged purpose of evaluating style shifts and below-average performance.  If either criterion is lacking for a significant period of time, The Hartford states that it will consider removing the investment option from the given plan's menu

of available investment choices and may recommend removal of the investment option from the existing plan's portfolio of investments. The Hartford can, in its discretion, offer additional funds to the participants of the Plans for which it serves as an administrator with different investment objectives and The Hartford has the discretion to substitute the shares of any registered investment company for the shares of any fund. In addition, The Hartford can, in its discretion, decide that a mutual fund is no longer commercially viable or feasible as an investment alternative, and unilaterally eliminate it from the investment options and/or investment portfolio of the Plans for which it serves as the administrator.

### 2.   The Neuberger Investment Advisory Contracts

26.     As part of the services that it provides to the Phones Plus Plan and other similarly situated ERISA retirement plans, The Hartford offers certain of the Plans for which it serves as an administrator the option of engaging Neuberger as an investment advisor to review these plans' needs annually and to select a specific group of investment choices to be offered to plan participants. Pursuant to these engagements, Neuberger reviews and evaluates mutual funds, collective funds, fixed accounts and other investment vehicles offered to the Plans for which it serves as an investment advisor. Neuberger charges the Phones Plus Plan, *inter alia*, an annual fee for these investment advisory services and charges other Plans, for which it serves as an investment advisor, similar fees. Under the Neuberger advisory agreement with The Hartford, The Hartford is authorized to automatically deduct the Neuberger annual fees from the Plan's assets under the terms of the Variable Annuity Contract. In its literature, although it attempts to disclaim its own fiduciary status, The Hartford expressly acknowledges the fiduciary status of Neuberger.

-11-

27.     As a fiduciary, at all pertinent times, Neuberger was under an absolute and continuing obligation to advise the Phones Plus Plan and other Plans as to the existence of the revenue sharing payments, that The Hartford was receiving excessive compensation for the services that it was providing, and that the Phones Plus Plan and other Plans should take legal or other appropriate action to recover and/or protect against the losses that they had sustained and were sustaining as a result of The Hartford's misconduct.

28.     Neuberger was obligated to discharge its duties solely in the interest of the Phones Plus Plan and the other Plans that had engaged it and was obligated to discharge its duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  Neuberger also was aware of the risk that the Phones Plus Plan and other Plans would be charged excessive fees by The Hartford and/or by mutual funds and was under an absolute and continuing duty to investigate fully the means appropriate to protect the Phones Plus Plan and other Plans from such risk.  By engaging in the above conduct, and permitting the Phones Plus Plan and the other Plans that had engaged Neuberger to invest, either directly or indirectly, in mutual funds that were charging inflated fees as a result of the revenue sharing payments or otherwise, Neuberger breached its fiduciary duties to the Phones Plus Plan and the other Plans that engaged it.

29.     The Phones Plus Plan and other members of the Sub-Class (defined below) have engaged Neuberger as a plan fiduciary investment advisor and are entitled to relief from Neuberger as a result of its breaches of fiduciary duty.

3.     **The Mutual Funds**

30.     Pursuant to its contracts with the Phone Plus Plan and other similarly situated ERISA retirement plans, The Hartford has the discretion to unilaterally cease offering mutual funds selected by participants and substitute other mutual funds selected by The Hartford in their place, and The Hartford has made such substitutions.

31.     From a technical perspective, the Plans and their participants do not invest directly in the mutual funds.  Rather, the Plans and their participants invest in "variable accounts" and other "separate accounts" established by The Hartford and other plan administrators.  The variable accounts established by The Hartford keep the assets separate from the general assets of The Hartford, and the variable accounts are not chargeable with any of The Hartford's liabilities outside of the variable accounts.

32.     The variable accounts maintained by The Hartford are divided into sub-accounts that correspond to the mutual funds and other investment options available under the annuity contracts that The Hartford maintains with the Plans for which it serves as an administrator. Pursuant to such contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and The Hartford, as well as other plan administrators, allocate those contributions to particular sub-accounts within the variable accounts that correspond to the chosen mutual funds.   In return for the contributions, which are assets of these ERISA qualified plans, the Plans for which The Hartford serves as an administrator and their participants receive accumulation units (shares) in the applicable sub-accounts of the variable accounts, which accumulation units are held by The Hartford.

33.     The accumulation units owned by the Plans and their participants and held by The

Hartford constitute plan assets.  Based on the combined contributions to the sub-accounts made by all these Plans and their participants, The Hartford sells and purchases mutual fund shares to hold in the variable accounts.  The value of a plan's accumulation units (shares) in the variable account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

34.    Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services.  Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees or 12b-1 fees.  Investors thereby effectively pay fees to the investment manager/mutual fund advisor for these and other services.  The mutual funds determine these fees, based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing the net asset value of all of the shares to decrease by the proportionate percentage attributable to these shares.  As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by The Hartford in a variable account decrease by a corresponding percentage, which, in turn, reduces the value of each Plan's and participant's accumulation of units held in The Hartford variable account.

35.    At all relevant times, the mutual funds offered by The Hartford to the Plans for which it serves as an administrator, virtually without exception, have not been the same mutual funds offered to individual investors.  Rather, these mutual funds have been either "clone" funds created by the mutual fund companies for investment by 401(k) plans investing through variable annuity contracts that imitate funds the same mutual fund companies offer to the general public

or funds created specifically for investment by 401(k) plans investing through variable annuity and similar contracts that do not mimic funds offered to the general public by the same mutual fund companies.  Certain of these funds have been owned and/or operated by The Hartford itself or its subsidiaries or affiliates.

36.     The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the revenue sharing payments that they have agreed to make to The Hartford and/or Neuberger.

**C.     The Revenue Sharing Scheme**

37.     The Hartford and Neuberger both hold themselves out to Plaintiff, the Class and the public as experts in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies and making investment recommendations.

38.     At all pertinent times, The Hartford implemented and participated in a scheme whereby mutual funds made revenue sharing payments to it based upon a percentage of the Plans' assets invested in these mutual funds, respectively, by and through The Hartford.  The Hartford implicitly and/or explicitly made it a condition to offering a mutual fund family's funds to the Plans that the mutual fund family pay them revenue sharing on a majority or all of the funds offered and/or recommended by The Hartford.

39.     To implement this scheme, The Hartford initiated changes to its contract pricing to account for revenue sharing arrangements and negotiated revenue sharing agreements with mutual funds on behalf of itself and its affiliates.

-15-

40.     Upon information and belief, revenue sharing payments are made to The Hartford pursuant to written contracts ("revenue sharing contracts"), often referred to as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, and these contracts are often entered into by and between The Hartford and the investment management firms that provide management and other services to mutual funds. These revenue sharing payments may be in the form of 12b-1 fees (which are supposed to be fees for marketing of the fund), administration fees, service fees, sub-transfer agent fees and/or similar fees.  All of the revenue sharing payments are based, in whole or in part, on a percentage of a given plan's investment in a mutual fund and/or based on the magnitude of the investments by the plan in the mutual fund.

41.     While the revenue sharing payments are often described in revenue sharing contracts as reimbursements for expenses incurred in providing services to the mutual funds, those services by which mutual funds may incidentally benefit are actually ones that The Hartford had historically provided to the Plans as a necessary part of its business in return for the fees directly collected by it, and these fees did not change as a result of revenue sharing or based upon the percentage or the magnitude of a plan's investments in the mutual fund.

42.     The revenue sharing payments are generally calculated based upon a percentage of the Plans' assets invested in the mutual funds by and through The Hartford.  These amounts are not based on the cost of providing the services or a reasonable fair market value for The Hartford's services.  Typically, the fees for The Hartford's services would be provided on an annual per participant basis and not on a percentage of assets or revenue sharing basis. Furthermore, the reasonable fair market price of The Hartford's services would be significantly

-16-

less than the amounts of the revenue sharing payments received by it.

43.     At all pertinent times, The Hartford (and/or their subsidiaries or affiliates) have been arranging for, receiving and keeping the revenue sharing payments for their own use and benefit in breach of their fiduciary duties under ERISA.  These revenue sharing payments range from twenty-five (25) basis points of the total assets of the Plans for each year during the Class Period to substantially greater revenue sharing payments.

44.     Under all of the circumstances, the revenue sharing payments received by The Hartford constituted excessive fees and otherwise violated ERISA.

## V.    CLASS ACTION ALLEGATIONS

45.     This action is brought as a class action by Plaintiff on behalf of itself and the following proposed class ("Class" or "Plans") and sub-class ("Sub-Class"):

> Class
>
> All employee pension benefit plans covered by ERISA for which The Hartford has received revenue sharing or similar payments from mutual funds or investment advisors based on the percentage or magnitude of the assets of the employee pension benefit plans invested in the mutual funds or similar investment vehicles.
>
> Excluded from the Class are Defendants, any employee pension benefit plans for which Defendants' directors, officers or employees are beneficiaries and any employee pension benefit plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary.
>
> Sub-Class
>
> All members of the Class for which Neuberger served as an investment advisor and/or ERISA fiduciary.
>
> Excluded from the Class are Defendants, any employee pension

benefit plans for which Defendants' directors, officers or employees are beneficiaries and any employee pension benefit plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary.

46.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

47.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

48.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)     whether Defendants acted and continue to act as fiduciaries under ERISA in connection with the conduct described herein;

(b)     whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(c)     whether The Hartford engaged in prohibited transactions by receiving the revenue sharing payments for its own benefit and otherwise charging excessive fees for the administrative and investment services it provided to the Plans;

(d)     whether Defendants failed to disclose or inform the Plans of the existence and true nature of the revenue sharing payments, as well as the excessive fees, received by The Hartford; and

(e)     whether and what form of relief should be afforded to Plaintiff and the Class.

49.   **Typicality**.  Plaintiff, who is a member of the Class, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

50.   **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

51.   **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which do not bar certification.

52.   **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of many Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

53.   **Manageability**.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis while the allocation and distribution of damages to Class members would be essentially a ministerial function.

54.   Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the revenue sharing scheme described above, which scheme Defendants clearly intend to continue to perpetrate in the future.  Accordingly, injunctive relief and equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

**COUNT I**
**(For Breach Of Fiduciary Duty)**

55.   Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

56.   Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), based on their authority and/or control with respect to the management and/or disposition of the Plans and their assets, as well as their provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendants' authority and responsibility with respect to the administration of the Plans.  Defendants control the selection of the mutual funds available as investment options for the Plans and participants; provide investment advice for compensation with respect to these investment options; use their custody and control of accumulated units of assets of the Plans to obtain revenue sharing payments from the mutual funds; and/or hold accumulated units for the benefit of the Plans,

cancel them to pay their fees, transfer them to use as collateral for loans, cancel them to pay loans, cancel them to purchase annuities, and cancel them to make cash payments. As fiduciaries, Defendants are prohibited from receiving benefits in connection with their control or exercise of authority over the Plans not specifically agreed to by the Plans or their participants in their contracts with Defendants.

57.     The revenue sharing payments made by the mutual fund companies to The Hartford constitute plan assets because: (a) The Hartford received the payments as a result of its fiduciary status or function (e.g., because The Hartford receive payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to The Hartford at the expense of the Plans and participants (e.g., because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge but also the amount of the revenue-sharing payments they have to make to The Hartford); and/or (c) revenue-sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

58.     The Hartford is, therefore, a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it controls or exercises authority respecting the management or disposition of these payments by arranging for, accepting and retaining them either directly or through their subsidiaries or affiliates.

59.     The Hartford's arranging for and retention (or the retention by their affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violate its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that The Hartford failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of

the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing

benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of

administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of a like character and with like aims.

60.     The Hartford breached its fiduciary duties, by using the possession of, control

over or influence with respect to accumulation units to generate the revenue-sharing payments for

their own benefit.  The Hartford did not use the accumulation units for the exclusive purpose of

providing benefits to participants and their beneficiaries and defraying reasonable expenses of

administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent

person.  As to the revenue sharing payments themselves, to the extent they constitute Plan assets,

The Hartford failed to use them for the exclusive purpose of providing benefits to participants

and their beneficiaries and defraying reasonable expenses of administering the Plans and also

failed to act with the care, skill, prudence and diligence of a prudent person.

61.     Neuberger breached its fiduciary duty to Plaintiff and certain of the Plans (i.e., the

Sub-Class), by (a) failing to advise such Plans as to the existence of the revenue sharing

payments, (b) failing to advise such Plans that The Hartford was receiving excessive

compensation for the services that it was providing, (c) failing to consider the existence of

revenue sharing payments and the payment of excessive compensation when determining which

investments to recommend to such Plans, (d) failing to advise such Plans that they should take

legal or other appropriate action to recover and/or protect against the losses that they had

sustained and were sustaining as a result of The Hartford's misconduct, (e) failing to investigate

whether such Plans were being charged excessive fees by The Hartford and/or by mutual funds. By knowingly permitting The Hartford's misconduct (or failing to investigate these matters so as to discover such misconduct), and engaging in the above described conduct, Neuberger breached its fiduciary duties to the Sub-Class.

62.      As a direct result of Defendants' breaches of duties, Plaintiff and the Class have suffered losses and damages.

63.      Pursuant to ERISA § 408, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are liable to restore to the Plans the losses they have suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

**COUNT II**
**(For Breach Of Fiduciary Duty And Violation Of ERISA's Prohibited Transaction Rules)**

64.      Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

65.      The Hartford has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in their own interest or for their own account.

66.      The Hartford's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by The Hartford amounts to and constitutes a fiduciary

receiving consideration (the revenue sharing payments) for their own personal account from parties (mutual funds) dealing with the Plans in connection with transactions (the so-called service and similar contracts) involving the assets of the Plans (the shares of the variable accounts, represented by the accumulation units).  Specifically, the mutual funds deal with the Plans by accepting funds from separate accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans -- the accumulation units.

67.     Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), The Hartford is liable to the Plans to disgorge and/or make restitution of all revenue sharing payments received by it and its subsidiaries or affiliates; or, alternatively, The Hartford is liable to the Plans and the Class to make restitution to the Plans in an amount representing the difference between the revenue sharing payments and the reasonable fair market value of any services provided by The Hartford to the mutual funds for which the revenue sharing payments purportedly constituted payment, and Plaintiff and the Class are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

68.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Class seeks an order declaring that the above-described practices of The Hartford in connection with the revenue sharing payments violate ERISA, as set forth above, and seeks a permanent injunction preventing The Hartford from engaging in such conduct in the future.

## COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

69.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

70.     Upon information and belief, HFS controlled and directed Hartford Life in engaging in the above conduct.  As a consequence, HFS is a fiduciary of the Plans in connection with the revenue sharing payments in the same manner and to the same extent as is Hartford Life. HFS violated its ERISA § 404 duties owed to the Plans and engaged in transactions prohibited by ERISA § 406.  Consequently, HFS is liable pursuant to ERISA §§ 409 and 502(a)(2) and (3) to the Plans in exactly the same manner and respect as Hartford Life, and the Plans are entitled to recover the exact same relief from HFS and Hartford Life on a joint and several basis.

71.     In the alternative, pursuant to ERISA § 405(a)(1), (2) and (3), 29 U.S.C. § 1105(a)(1), (2) and (3), HFS is jointly and severally liable to the Plans as a co-fiduciary for Hartford Life's breaches of fiduciary duty set forth above.

72.     In the alternative, to the extent that any of the Defendants are not deemed fiduciaries or co-fiduciaries under ERISA, each of the Defendants is liable to the Class for all recoverable damages and relief as non-fiduciaries that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment against Defendants, The Hartford Financial Services Group Inc., Hartford Life Insurance Company and Neuberger Berman Management, Inc., jointly and severally, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as detailed above;

(b)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

-25-

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Amended Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: March 5, 2007                    Respectfully submitted,

/s/ Patrick A. Klingman
James E. Miller
Federal Bar I.D. No. CT-21560
Patrick A. Klingman
Federal Bar I.D. No. CT-17813
Karen M. Leser
Federal Bar I.D. No. CT-23587
Shepherd Finkelman Miller & Shah, LLC
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120

Douglas P. Dehler
Shepherd Finkelman Miller & Shah, LLC
111 E. Wisconsin Avenue, Suite 1750
Milwaukee, WI 53202
Telephone:  (414) 226-9900
Facsimile:  (414) 226-9905

Attorneys for Plaintiff and the Proposed Class

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2007, a copy of the foregoing was filed electronically and served by electronic mail on the counsel listed below.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Joseph T. Baio, Esquire
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY 10019-6099
jbaio@willkie.com

/s/ Patrick A. Klingman
Patrick A. Klingman (ct17813)
**Shepherd Finkelman Miller & Shah, LLC**
65 Main Street
Chester, Connecticut  06412
Phone: (860) 526-1100
Fax: (860) 526-1120
E-mail: pklingman@sfmslaw.com