IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PHONES PLUS, INC, Plan Administrator | : | CIVIL ACTION |
| of the Phones Plus Retirement Savings Plan, | : | NO. 3:06-CV-1835 (AVC) |
| On Behalf of Itself and All Others Similarly | : | |
| Situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | SECOND AMENDED |
| | : | CLASS ACTION COMPLAINT |
| HARTFORD LIFE INSURANCE | : | |
| COMPANY and NEUBERGER BERMAN | : | JURY TRIAL DEMANDED |
| MANAGEMENT, LLC, | : | |
| | : | |
| Defendants. | : | JANUARY 16, 2009 |

Plaintiff, Phones Plus, Inc. ("Plaintiff" or "Phones Plus"), by and through its undersigned

counsel, in support of this Second Amended Complaint, hereby pleads and avers as follows:

## I.   INTRODUCTION

1.      This is an action for equitable relief and damages under the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§1001 *et seq.*, in which Plaintiff seeks to recover,

for the benefit of the Plaintiff's 401(k) plan and all other similarly situated retirement plans, also

known as employee pension benefit plans under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A),

which are subject to Internal Revenue Code ("IRC") § 401(k), payments from mutual funds,

mutual fund advisors, investment funds, including collective trusts, and/or other investment

instruments/vehicles (collectively, "mutual funds") to Defendant, Hartford Life Insurance

Company ("the revenue sharing payments").

2.      Defendant, Hartford Life Insurance Company ("Hartford" or "Hartford Life" or

"The Hartford"), as well as its affiliates, have entered into revenue sharing agreements and

arrangements with various mutual funds, including certain Hartford affiliated mutual funds,

pursuant to which The Hartford receives these kickback payments for its own benefit in violation

of, *inter alia*, ERISA's prohibited transaction rules, ERISA §§ 404 and 406(b), 29 U.S.C. §§

1104 and 1106(b), and ERISA's fiduciary rules, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§

1104(a)(1)(A) and (B).

      3.      As explained below, at all pertinent times, Defendant, Neuberger Berman

Management, LLC ("Neuberger Berman" or "Neuberger"), acted as a fiduciary of Plaintiff's

retirement plan and other similarly situated retirement plans and, as a result of its acts, omissions

and breaches of fiduciary duty, Neuberger Berman is legally responsible for the losses suffered

by Plaintiff's retirement plan and certain similarly situated retirement plans, which are the subject

of this action.

      4.      Plaintiff brings this action on its own behalf and on behalf of all those similarly

situated, under ERISA §§ 409(a) and 502(a)(2) and (g), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and

(g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein;

- Disgorgement and/or restitution of all the revenue sharing payments received by The Hartford, or, alternatively, the difference between the revenue sharing payments and the reasonable fair market value of any services provided by The Hartford to the mutual funds for which the revenue sharing payments purportedly constituted payment;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

5.      Plaintiff is the Plan Administrator of the Phones Plus, Inc. 401-K Profit Sharing

Plan (the "Phones Plus Plan" or the "Plan").  In that capacity, Phones Plus is a fiduciary of the

Plan.  Both the Phones Plus Plan and Phones Plus are located at 2745 South Calhoun Road, New

Berlin, Wisconsin 53151.

6.      Defendant, Hartford Life, is a Connecticut corporation, which maintains its

principal place of business at 200 Hopmeadow Street, Simsbury, Connecticut.  Hartford Life is a

fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

Hartford Life is headquartered in this State and, upon information and belief, transacts business

in every State in the United States of America.

7.      Defendant, Neuberger Berman, is a financial service company, organized under

the laws of the State of New York, which is the successor to Neuberger Berman Management,

Inc. and maintains its principal place of business at 605 Third Avenue, 2nd Floor, New York,

New York.  Neuberger is an investment advisor to the Plan and an ERISA fiduciary within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   Upon information and belief,

Neuberger transacts business in most, if not all, of the States of the United States of America,

including the State of Connecticut.

## III.    JURISDICTION AND VENUE

8.      Plaintiff seeks relief on behalf of the Phones Plus Plan and other similarly situated

plans and entities (collectively, the "Plans"), pursuant to ERISA's civil enforcement remedies

with respect to fiduciaries and other interested parties and, specifically, under ERISA § 409, 29

U.S.C. § 1109, and 29 U.S.C. § 1132.  This Court has jurisdiction over this action pursuant to 28

U.S.C. § 1331 and ERISA § 502(e)(1)(2), 29 U.S.C. § 1132(e)(1)(2).

9.      Venue is proper in this judicial district under ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2) and under 28 U.S.C. § 1391, because Hartford Life is headquartered in this judicial

district, a substantial part of the events or omissions giving rise to the claims occurred and/or

arose in this judicial district and a substantial part of the challenged conduct occurred in and/or

emanated from this judicial district.  In addition, all of the Defendants regularly transact business

in this judicial district.

## IV.    BACKGROUND FACTS

### A.    The Plans

10.      At all pertinent times, the Phones Plus Plan was a 401(k) retirement plan and, as

of the date of the filing of this Second Amended Complaint, it remains a 401(k) retirement plan.

Phones Plus and the Plan participants have funded and continue to fund the Plan.  Under the

Phones Plus Plan, and through the Plan's contract with The Hartford, participants were entitled to

invest in the various mutual funds selected for inclusion as investment options within the Plan by

The Hartford and Neuberger.

11.      Plaintiff is informed and believes that thousands of qualified ERISA retirement

plans are members of the Class, as defined below, which contracted with The Hartford  to

provide services with respect to the investment of these Plans' assets during the Class Period.

### B.    The Relationship Between Class Members, The Hartford, Neuberger And The Mutual Funds

12.      The employers who are the sponsors and plan administrators of the Plans that

compose the Class engage full-service providers, such as The Hartford, to design and implement

the qualified ERISA retirement plans and to provide an entire range of administrative and other services necessary to operate them.  Agents of The Hartford solicit business on its behalf on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for The Hartford receive commissions for obtaining such business for The Hartford.  In addition, agents of The Hartford request and effectively direct plans that they are soliciting to select Neuberger (or similar entities) as their investment advisor.

13.    In promoting its services, The Hartford trumpets the "investment choices" that it offers on the basis that they "span the risk/return spectrum," as well as "its experienced people, . .. well-designed program ... and over 170 highly qualified retirement professionals...."  In addition, despite claims that it only serves as a "provider" in an attempt to disclaim fiduciary responsibility despite its clear fiduciary duties, The Hartford's own literature recognizes the true nature of its role and fiduciary capacity by promoting The Hartford's ranking as "Top Plan Administrator" and "Top Fund Manager" in the "$1 to $10 million market" according to "IOMA's *Managing 401K Plans* (December 2002)," and quotes a client as stating: "I wouldn't change a thing with The Hartford [and] [t]hey cover everything."  In light of its fiduciary status and duties, The Hartford engaged Neuberger to perform a comprehensive review of the investment options made available to all of the Plans (*i.e.*, mutual funds) and to recommend changes to The Hartford as to those mutual funds that should remain on The Hartford's menu of funds.  At all times, however, The Hartford maintained the ultimate discretion with respect to those mutual funds that would be offered on its menu of permissible investments.

14.    After setting up a qualified ERISA retirement plan such as the Phones Plus Plan, The Hartford provides all of the services necessary for such plans to operate, including

record-keeping, compliance, allocation of participant contributions, distribution of account

proceeds to departing participants, loan processing and administration, asset transfers, IRS tax

withholding and reporting, provision of benefits illustrations, processing and distribution of

benefits and withdrawals, and administration of communications with participants.

### 1.    The Hartford Contracts

15.    The Hartford enters into two standard form contracts with virtually all of the

Plans: an Administrative Services Agreement ("ASA") and a Group Annuity Contract or Group

Funding Agreement (collectively, "GAC").

16.    The standard form ASA pertains to accounting for contributions to the GAC

(which creates a self-described "funding vehicle for retirement plans"), benefit payments from

the GAC, the withholding of taxes from such benefit payments, and tax reporting to participants,

annuitants, and government agencies.  Pursuant to the standard form ASA, the Phones Plus Plan

and other similarly situated plans entrust The Hartford with contributions to these plans so that

The Hartford can properly allocate the participant contributions.

17.    Under the GACs, The Hartford provided and continues to provide investment

options to the Phones Plus Plan and other similarly situated plans through insurance products

called group variable annuities or through similar vehicles.

18.    The GACs provided and provide for payment by the Phones Plus Plan and other

similarly situated plans to The Hartford of separate account fees (the "Mortality and Expense

Risk Charges"), which are calculated as a percentage of the daily value of a given plan's

investment in the separate accounts in and through which The Hartford purchased, sold and held

the shares of the underlying mutual funds, and for payments of brokerage commissions, transfer

taxes and any expenses incurred by The Hartford, which The Hartford determines are reasonably necessary to preserve or enhance the value of the assets in the sub-accounts representing these plans' ERISA qualified retirement investments.

19.    The GACs do not disclose that The Hartford will receive any other benefits for the services provided to the Plans (or the mutual funds).  None of the GACs (which are standard forms) entered into by The Hartford with the Phones Plus Plan and other similarly situated plans discloses that revenue sharing payments will be made by mutual funds to The Hartford.

20.    In a document entitled Plan Sponsor Submission Information, which references the ASA and the GAC, as well as in subsequent statements, The Hartford has attempted to insulate itself from liability for its misconduct by representing that it receives fees "for administrative and other services" from "many, but not all, of the underlying [mutual] funds that are offered as variable investment choices through the Group Variable Annuity Contract."  In an attempt to avoid liability, The Hartford, however, has explicitly characterized these fees at the time that it made such representations as constituting payments for the following services: "recordkeeping, accounting, and the mailing of periodic reports, fund prospectuses and proxy materials, processing of purchase and redemption transactions, and marketing assistance services" and falsely asserted that "[t]hese fees do not constitute compensation for investment advisory services."  The Hartford's attempt to foreclose its liability through such disclosures fails on its face because (a) the payments at issue are *per se* unlawful and cannot be excused by alleged disclosure or purported consent; and (b) Defendant's alleged disclosures themselves were false and misleading on their face, since The Hartford failed to disclose that the revenue sharing kickbacks served as the foundation of an illegal pay-to-play scheme and that the revenue sharing

payments did not directly relate to administrative services but, rather, related to investment advisory services or to Hartford Life's recommendation of mutual funds to the Plans. Hartford Life has admitted that, in the context of its internal cost accounting (or lack thereof), it treats all of the Plans in exactly the same manner, since it does not calculate or account for expenses incurred for or on behalf of any of the Plans, or for revenues received from or on behalf of any of the Plans. That is because Hartford Life approaches its business by placing all revenues in a collective bucket, and offsetting all expenses incurred from that collective bucket, without accounting for (or having the ability to account for) the expenses incurred on behalf of any of the Plans.

21.     After this lawsuit was filed, in early 2007, in a vain effort to foreclose continuing liability for its misconduct and as part of a strategy by The Hartford to avoid liability for its misconduct, as well as its past false statements, The Hartford issued the following statement and made the following admissions with respect to its receipt of revenue sharing payments:

> We want you to know that Hartford [Hartford Life Insurance Company and its affiliates] receives substantial fees and payments with respect to the underlying funds that are offered as Sub-Accounts to your Plan through the Contract. We consider these fees and payments, among a number of other factors, when deciding to include a fund to the menu of Funds that we offer through the Contract. These fees and payments are received by Hartford under agreements between Hartford and the principal underwriters, transfer agents, investment advisers and/or other entities related to the Funds in amounts up to 1.30% of assets invested in a Fund. These fees and payments may include asset based sales compensation and service fees under distribution and/or servicing plans adopted by funds pursuant to Rule 12b-1 under the Investment Company Act of 1940. They may also include administrative service fees and additional payments, expense reimbursement and compensation *sometimes referred to as "revenue sharing" payments*. Hartford receives these fees and payments for its own account and expects to make a profit on the amount of the fees and payments that exceed Hartford's own expenses, including our expenses of paying compensation to broker-dealers, financial institutions and other persons for selling the Contracts.

We also want you to understand that not all fund families pay the same amount of fees and compensation to us and not all funds pay according to the same formula. Because of this, the amount of fees and payments received by Hartford varies by fund and Hartford may receive greater or less fees and payments depending on which variable investment options your Plan selects.

*          *          *

You should know that the principal underwriters of certain funds have chosen to offer for sale, and Hartford has selected, fund share classes with asset based sales charges and/or service fees that may or may not be higher than other available share classes of the same fund.  As a result of any higher asset based fees and charges paid by investors in such share classes, the amount of fees and payments that might otherwise need to be paid by such fund principal underwriters or their affiliates to Hartford would decrease.

Some of the Sub-Accounts available in the Contract invest in Funds that are part of our own affiliated family of funds.  In addition to any fees and payments Hartford may receive with respect to those funds, one or more of our affiliates receives compensation from the funds, including among other things a management fee and 12b-1 fees from the funds.  (Emphasis added.)

22.     This belated admission regarding The Hartford's receipt and profit from revenue sharing payments for its own account, in addition to confirming that The Hartford's past representations regarding the nature of the fees that it receives from mutual funds were false and misleading when issued, is of little or no consequence since (a) the payments at issue are *per se* unlawful and cannot be excused by alleged disclosure or purported consent; and (b) The Hartford's new statements on the subject themselves are false and misleading on their face, since The Hartford (1) falsely seeks to characterize the revenue sharing payments as having been previously and fully disclosed by referring the Plans to their "Contracts" for more information even though The Hartford's "Contracts" and related disclosures contain false and misleading statements with respect to the quantum, nature, character and purpose of the revenue sharing payments at issue (which are directly at odds with The Hartford's new, post-litigation statements

-9-

on the subject); (2) continues to misrepresent and attempts to minimize the amount of revenue

sharing payments received and the nature of such payments; and (3) upon information and belief,

falsely implies that higher asset based fees charged by mutual funds to the Plans, which are used

to generate the revenue sharing payments, replace other fees that otherwise would be paid to The

Hartford.  Of course, The Hartford's recent statement and partial admissions regarding revenue

sharing payments also fail to advise the Plans of the pendency of this litigation, the fact that the

statement was issued in response to the filing of this action or as part of a strategy to address

litigation of this kind and/or that it is the position of Plaintiff that The Hartford's receipt of the

revenue sharing payments is unlawful.

       23.    In return for the fees and other amounts charged to the Plan and other similarly

situated Plans, The Hartford selects, maintains and monitors a menu of mutual funds available

for investment by these Plans.  The Hartford has engaged Neuberger and other investment

advisors, who annually review the investment options available to participants in these Plans,

purportedly for the purpose and to ensure that the investment options comprise a wide array of

asset classes and money managers that can be used to build a well-diversified retirement program

for 401(k) participants.  Neuberger, other investment advisors similarly selected by The Hartford,

or the Plans themselves (if these Plans choose not to engage Neuberger or a similar investment

advisor) select a subset of the funds contained in the menu of funds created by The Hartford as

investment options for the retirement plan participants.

      24.    The Hartford periodically reviews the menu of investment options available to the

Plans for the alleged purpose of evaluating style shifts and below-average performance.  If either

criterion is lacking for a significant period of time, The Hartford states that it will consider

removing the investment option from the given plan's menu of available investment choices and may recommend removal of the investment option from the existing plan's portfolio of investments. The Hartford can, in its discretion, offer additional funds to the participants of the Plans with different investment objectives and The Hartford has the discretion to add, delete or substitute the shares of any registered investment company for the shares of any other fund. In addition, The Hartford can, in its discretion, decide that a mutual fund is no longer commercially viable or feasible as an investment alternative, and unilaterally eliminate it from the investment options and/or investment portfolio of the Plans.

25.     The prototype Basic Plan Document that governs the Phones Plus Plan and many other of the Plans also recognizes The Hartford's fiduciary status by giving The Hartford discretion to select permissible investments and limit the investment vehicles available to these Plans. Paragraph 7.22(d) of the Basic Plan Document states as follows: "[T]he Prototype Sponsor [The Hartford] may, as a condition of making the Plan available to the adopting employer, limit the type of property in which the assets of the Plan may be invested." This sentence vests the Hartford with discretion in connection with the administration of the Plan. Moreover, The Hartford has exercised that discretion by limiting the property held by the Plan to mutual funds that agreed to pay the revenue sharing kickbacks it demanded. The Hartford also continued to exercise that discretion by refusing to open up the investments available to the Plans to mutual funds that declined to participate in The Hartford's pay-to-play scheme. That discretion was exercised continuously throughout the time that Phones Plus has maintained its Plan with The Hartford.

26.     The Hartford's primary criterion for inclusion of a mutual fund on its menu of

-11-

funds is the amount of revenue sharing payments that the mutual fund is willing to pay The

Hartford, and this criterion trumps all other criteria, including the appropriateness of the

investment and/or the fees and costs that the Plans (and their participants) will be required to pay

as a result of, *inter alia*, asset based charges and the share classes of the designated mutual funds.

27.     The Hartford does not include any mutual funds on its menu of available

investments unless the mutual funds agree to pay a prescribed amount of revenue sharing

kickbacks to it.  In fact, The Hartford regularly negotiates to increase the amount of revenue

sharing payments from mutual funds without regard for whether these increased payments will

increase the cost charged by mutual funds to its clients as it crassly seeks to negotiate and

determine its own compensation without disclosing the true nature of its conduct to its customers

and the Plans.

### 2.     The Neuberger Investment Advisory Contracts

28.     As part of the services that it provides to the Phones Plus Plan and other similarly

situated ERISA retirement plans, The Hartford offers certain of the Plans the option of engaging

Neuberger as an investment advisor to review these Plans' needs annually and to select a specific

group of investment choices to be offered to plan participants.  Pursuant to these engagements,

Neuberger reviews and evaluates mutual funds, collective funds, fixed accounts and other

investment vehicles offered to the Plans for which it serves as an investment advisor.  Neuberger

charges the Phones Plus Plan, *inter alia*, an annual fee for these investment advisory services and

charges other Plans, for which it serves as an investment advisor, similar fees.  Under the

Neuberger advisory agreement with The Hartford, The Hartford is authorized to automatically

deduct the Neuberger annual fees from each of the Plans' assets under the terms of the GAC.  In

its literature, although it attempts to disclaim its own fiduciary status, The Hartford expressly acknowledges the fiduciary status of Neuberger.

29.     As a fiduciary, at all pertinent times, Neuberger was under an absolute and continuing obligation to advise the Phones Plus Plan and other Plans as to the existence of the revenue sharing payments, that The Hartford was receiving illegal and/or excessive compensation for the services that it was providing, and that the Phones Plus Plan and other Plans should take legal or other appropriate action to recover and/or protect against the losses that they had sustained and were sustaining as a result of The Hartford's misconduct.

30.     Neuberger was obligated to discharge its duties solely in the interest of the Phones Plus Plan and the other Plans that had engaged it and was obligated to discharge its duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Neuberger also was aware of the risk that the Phones Plus Plan and other Plans would be charged illegal and/or excessive fees by The Hartford and/or by mutual funds and was under an absolute and continuing duty to investigate fully the means appropriate to protect the Phones Plus Plan and other Plans from such risk. By engaging in the above conduct, and permitting the Phones Plus Plan and the other Plans that had engaged Neuberger to invest, either directly or indirectly, in mutual funds that were charging inflated fees as a result of the revenue sharing payments or otherwise, Neuberger breached its fiduciary duties to the Phones Plus Plan and the other Plans that engaged it.

31.     The Phones Plus Plan and other members of the Sub-Class (defined below) have engaged Neuberger as a plan fiduciary investment advisor and are entitled to relief from

-13-

Neuberger as a result of its breaches of fiduciary duty.

### 3.   The Mutual Funds

32.     Pursuant to its contracts with the Phone Plus Plan and other similarly situated

ERISA retirement plans, The Hartford has the discretion to unilaterally cease offering mutual

funds selected by participants and substitute other mutual funds selected by The Hartford in their

place.  The Hartford has exercised its discretion to cease offering mutual funds on its menu of

available funds and has made such deletions from its menu of available funds.  The Hartford also

monitors the investment performance of all mutual funds and regularly adds, deletes, substitutes

and ceases offering mutual funds on its menu of available investments for current and future

Plans.  In a transparent attempt to avoid the reality of its fiduciary status and the well founded

rules prohibiting fiduciary self-dealing, The Hartford crassly and perversely has adopted a policy

pursuant to which it affirmatively chooses *not* to advise current Plans which are invested in a

mutual fund (or offer the mutual fund as an available investment to participants) if the mutual

fund is being deleted from the available menu of investment options for current Plans that do not

offer the mutual fund as an investment alternative at that time and for future Plans, whether for

performance or other reasons.  That attempt to avoid fiduciary status to justify its self-dealing

ultimately fails for at least reasons: (a) The Hartford acquires fiduciary status because it

maintains the discretion to delete, substitute or add mutual funds for all current Plans, regardless

of whether such discretion is exercised; (b) The Hartford acquires fiduciary status because it

indisputably changes the menu of available investment options for current Plans when it adds

mutual funds to its menu of available funds (which additions are available to all current and

future Plans when they are offered) and when it deletes or substitutes mutual funds on its menu

-14-

of available funds (which deletions or substitutions affect the available investments for all current Plans that neither have invested in such mutual funds nor offered such mutual funds as available investments to participants on such Plans' selected menu of investments of mutual funds at the time of the deletion or substitution); and (c) The Hartford failed to provide the Plans with any notice of or meaningful opportunity to reject the investment decisions that The Hartford effectively was making for the Plans by engaging in such conduct.

33.     From a technical perspective, the Plans and their participants do not invest directly in the mutual funds.  Rather, the Plans and their participants invest in "variable accounts" and other "separate accounts" (collectively, "separate accounts") established by The Hartford.  The separate  accounts are established and owned by The Hartford and keep the assets separate from the general assets of The Hartford.

34.     Under the terms of its own contracts, and in recognition of its fiduciary status, The Hartford holds the Plans' assets in separate accounts under its own name, places those funds in short-term investments as it sees fit (*i.e.*, in its discretion), and may set off certain amounts the funds held in those separate accounts, based on its own unilateral determinations, before ultimately transferring the Plans' assets to mutual funds in return for which it is paid kickbacks.

35.     The separate accounts maintained by The Hartford are divided into sub-accounts that correspond to the mutual funds and other investment options available under the GACs that The Hartford maintains with the Plans.  Pursuant to such contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and The Hartford allocates those contributions to particular sub-accounts within the separate accounts that correspond to the chosen mutual funds.   In return for the

contributions, which are assets of these ERISA qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the separate accounts, which accumulation units, like the separate accounts themselves and the sub-accounts, are held and owned by The Hartford.  The Hartford maintains authority and control over the separate accounts, the sub-accounts and the accumulation units.

36.    The accumulation units of the Plans and their participants, which are held by The Hartford, like the separate accounts and sub-accounts, constitute plan assets.  Based on the combined contributions to the sub-accounts made by all these Plans and their participants, The Hartford sells and purchases mutual fund shares to hold in the separate accounts (and receives revenue sharing kickbacks in return for these purchases).  The Hartford indisputably holds, owns, manages and controls the separate accounts, as well as their sub-accounts, and uses the separate accounts as a delivery mechanism to purchase and sell shares in the mutual funds.  In direct return for delivering these funds from the separate accounts to the mutual funds, The Hartford receives the revenue sharing kickbacks at issue.  The value of a plan's accumulation units (shares) in the separate account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

37.    Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services.  Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees or 12b-1 fees.  Investors thereby effectively pay fees to the mutual funds for these and other services.  The mutual funds determine these fees, based on a

-16-

designated percentage of the net asset value of all of the shares held in the mutual fund, causing

the net asset value of all of the shares to decrease by the proportionate percentage attributable to

these shares.  As a result of the charging of these fees, by way of example, the value of the

mutual fund shares held by The Hartford in a separate account decrease by a corresponding

percentage, which, in turn, reduces the value of each Plan's and participant's accumulation of

units held by The Hartford in the separate accounts.

      38.     At all relevant times, the mutual funds offered by The Hartford to the Plans have

been offered through variable annuity and similar contracts.  Certain of these funds have been

owned and/or operated by The Hartford itself or its subsidiaries or affiliates.

      39.     The mutual funds establish the percentages of the Plans' assets that they charge as

fees for their services to cover their normal operating expenses, as well as anticipated profit, and

the amount of the revenue sharing payments that they have agreed to make to The Hartford.

      40.     The revenue sharing payments do not bear any relationship to any services

performed by The Hartford.  In an effort to conceal the nature of its misconduct and the manner

in which it literally has lined its pockets with tens of millions of dollars in revenue sharing

payments by and through self-dealing and other prohibited transactions, The Hartford has

adopted a policy or practice of eschewing the term "revenue sharing" and, instead, both internally

and externally has directed and requested that the payments be referred to as "service fees."  The

hypocritical and disingenuous nature of this self-serving, adopted nomenclature is reflected by

the fact that The Hartford cannot ascribe specific services performed to the revenue sharing

payments received and, when The Hartford obtains increased revenue sharing payments from

mutual funds, it provides no additional services.

C.     **The Revenue Sharing Scheme**

41.     The Hartford and Neuberger both hold themselves out to Plaintiff, the Class and the public as experts in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies and making investment recommendations.

42.     At all pertinent times, The Hartford implemented and participated in a scheme whereby mutual funds made revenue sharing payments to it based upon a percentage of the Plans' assets invested in these mutual funds, respectively, by and through The Hartford.  The Hartford explicitly made it a condition to offering a mutual fund family's funds to the Plans that the mutual fund family pay them revenue sharing on all of the funds offered and/or recommended by The Hartford.

43.     To implement this scheme, The Hartford negotiated revenue sharing agreements with mutual funds on behalf of itself and its affiliates.

44.     Upon information and belief, revenue sharing payments are made to The Hartford pursuant to written contracts ("revenue sharing contracts" or "participation agreements"), often referred to as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, and these contracts are often entered into by and between The Hartford and the investment management firms that provide management and other services to mutual funds.  These revenue sharing payments may be in the form of 12b-1 fees (which are supposed to be fees for marketing of the fund), administration fees, service fees, sub-transfer agent fees and/or similar fees.  All of the revenue sharing payments are based, in whole or in part, on a percentage of a given plan's investment in a mutual fund and/or based on

the magnitude of the investments by the Plans in the mutual fund.

45.    While the revenue sharing payments are often described in revenue sharing contracts as reimbursements for expenses incurred in providing services to the mutual funds, those services by which mutual funds may incidentally benefit are actually ones that The Hartford had historically provided to the Plans as a necessary part of its business in return for the fees directly collected by it, and these fees did not change as a result of revenue sharing or based upon the percentage or the magnitude of a plan's investments in the mutual fund.

46.    The revenue sharing payments are generally calculated based upon a percentage of the Plans' assets invested in the mutual funds by and through The Hartford.  These amounts are not based on the cost of providing the services or a reasonable fair market value for The Hartford's services.  Typically, the fees for The Hartford's services would be provided on an annual per participant basis and not on a percentage of assets or revenue sharing basis. Furthermore, the reasonable fair market price of The Hartford's services would be significantly less than the amounts of the revenue sharing payments received by it.

47.    At all pertinent times, The Hartford has been arranging for, receiving and keeping the revenue sharing payments for its own use and benefit in breach of its fiduciary duties under ERISA.  These revenue sharing payments range from twenty-five (25) basis points of the total assets of the Plans for each year during the Class Period to substantially greater revenue sharing payments.

48.    Under all of the circumstances, the revenue sharing payments received by The Hartford constituted excessive fees and otherwise violated ERISA.

-19-

## V.   CLASS ACTION ALLEGATIONS

49.     This action is brought as a class action by Plaintiff on behalf of itself and the

following proposed class ("Class" or "Plans") and sub-class ("Sub-Class"):

### Class

All administrators of employee pension benefit plans covered by
the Employee Retirement Income Security Act of 1974 ("ERISA")
subject to Internal Revenue Code ("IRC") § 401(k) for which,
since November 14, 2003, The Hartford has received revenue
sharing payments (*e.g.*, asset based sales compensation, service
fees under distribution and/or servicing plans adopted by funds
pursuant to Rule 12b-1 under the Investment Company Act of
1940, administrative service fees and additional payments, expense
reimbursement and other similar compensation) from any mutual
fund or investment advisor.

### Sub-Class

All members of the Class for which Neuberger served as an
investment advisor and/or fiduciary under ERISA.

Excluded from the Class are Defendants, any administrators of employee pension benefit plans

for which Defendants' directors, officers or employees are beneficiaries and any employee

pension benefit plans for which the Judge to whom this case is assigned or any other judicial

officer having responsibility for this case is a beneficiary.

50.     This action may be maintained as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

51.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of

Class members (and hundreds of Sub-Class members) throughout the United States.  As a result,

the members of the Class and Sub-Class are so numerous that their individual joinder in this

action is impracticable.

-20-

52.    **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class and Sub-Class, including, but not limited to the following:

(a)    whether Defendants acted and continue to act as fiduciaries under ERISA in connection with the conduct described herein;

(b)    whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(c)    whether The Hartford engaged in prohibited transactions by receiving the revenue sharing payments for its own benefit and otherwise charging excessive fees for the administrative and investment services it provided to the Plans;

(d)    whether Defendants failed to disclose or inform the Plans of the existence and true nature of the revenue sharing payments, as well as the excessive fees, received by The Hartford; and

(e)    whether and what form of relief should be afforded to Plaintiff and the Class and/or Sub-Class.

53.    **Typicality**.  Plaintiff, which is a member of the Class and Sub-Class, has claims that are typical of all of the members of the Class and Sub-Class.  Plaintiff's claims and all of the Class and Sub-Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class and Sub-Class.

54.    **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class and Sub-Class.  Plaintiff has no conflicts of interest with or

interests that are any different from the other members of the Class and Sub-Class. Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

55.    **Predominance**. Common questions of law and fact predominate over questions affecting only individual Class and Sub-Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class and Sub-Class member, the calculation of which will ultimately be a ministerial function and which do not bar certification.

56.    **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class and Sub-Class members are unaware of Defendants' breaches of fiduciary duty such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of many Class and Sub-Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

57.    **Manageability**. This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide and Sub-Class wide basis while the allocation and distribution of damages to Class and Sub-Class members would be essentially a ministerial function.

58.     Defendants have acted on grounds generally applicable to the Class and Sub-Class, as applicable, by uniformly subjecting them to the revenue sharing scheme described above, which scheme Defendants clearly intend to continue to perpetrate in the future. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class and Sub-Class as a whole.

**COUNT I**
**(For Breach Of Fiduciary Duty)**

59.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

60.     Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), as explained above, and based on their discretion, authority and/or control with respect to the management and/or disposition of the Plans and their assets, as well as their provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendants' authority and responsibility with respect to the administration of the Plans.  Defendants control the selection of the mutual funds available as investment options for the Plans and participants; provide investment advice for compensation with respect to these investment options; use their custody and control of separate accounts and accumulated units of assets of the Plans to obtain revenue sharing payments from the mutual funds; and/or hold accumulated units for the benefit of the Plans.  As fiduciaries, Defendants are prohibited from receiving benefits in connection with their discretion, control or exercise of authority over the Plans and their assets..

-23-

61.    The revenue sharing payments made by the mutual fund companies to The Hartford constitute plan assets because: (a) The Hartford received the payments as a result of its fiduciary status or function (*e.g.*, because The Hartford receive payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to The Hartford at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge but also the amount of the revenue-sharing payments they have to make to The Hartford); and/or (c) revenue-sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

62.    The Hartford is, therefore, a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it has discretion and controls or exercises authority respecting the management or disposition of these payments by arranging for, accepting and retaining them either directly or through their subsidiaries or affiliates.

63.    The Hartford's arranging for and retention (or the retention by their affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violate its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that The Hartford failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

-24-

64.     The Hartford breached its fiduciary duties, by using its discretion and the possession of, control over or influence with respect to the separate accounts and the accumulation units to generate the revenue-sharing payments for their own benefit.  The Hartford did not use the separate accounts and the accumulation units for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent person.  As to the revenue sharing payments themselves, to the extent they constitute Plan assets, The Hartford failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.

65.     Neuberger breached its fiduciary duty to Plaintiff and certain of the Plans (*i.e.*, the Sub-Class), by (a) failing to advise such Plans as to the existence of the illegal revenue sharing payments, (b) failing to advise such Plans that The Hartford was receiving illegal or excessive compensation for the services that it was providing, (c) failing to consider the existence of revenue sharing payments and the payment of illegal or excessive compensation when determining which investments to recommend to such Plans, (d) failing to advise such Plans that they should take legal or other appropriate action to recover and/or protect against the losses that they had sustained and were sustaining as a result of The Hartford's misconduct, and (e) failing to investigate whether such Plans were being charged illegal or excessive fees by The Hartford and/or by mutual funds.  By knowingly permitting The Hartford's misconduct (or failing to investigate these matters so as to discover such misconduct), and engaging in the above described conduct, Neuberger breached its fiduciary duties to the Sub-Class.

66.    As a direct result of Defendants' breaches of duties, Plaintiff and the Class have suffered losses and damages.

67.    Pursuant to ERISA § 408, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are liable to restore to the Plans the losses they have suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

### COUNT II
### (For Breach Of Fiduciary Duty And Violation Of ERISA's Prohibited Transaction Rules)

68.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

69.    The Hartford has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or for its own account.

70.    The Hartford's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by The Hartford amounts to and constitutes a fiduciary receiving consideration (the revenue sharing payments) for its own personal account from parties (mutual funds) dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans (held in the separate or sub-accounts accounts, and/or represented by the accumulation units).  Specifically, the mutual funds deal with

-26-

the Plans by accepting funds from separate accounts that represent the investment of the Plans'

assets, and they do so in connection with transactions involving the assets of the Plans.

71.     Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2),

The Hartford is liable to the Plans to credit back, disgorge and/or make restitution of all revenue

sharing payments received by it; or, alternatively, The Hartford is liable to the Plans and the

Class to make restitution to the Plans in an amount representing the difference between the

revenue sharing payments and the reasonable fair market value of any services provided by The

Hartford to the mutual funds for which the revenue sharing payments purportedly constituted

payment, and Plaintiff and the Class are entitled to all equitable or remedial relief as the Court

may deem appropriate and just.

72.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Class seeks an order

declaring that the above-described practices of The Hartford in connection with the revenue

sharing payments violate ERISA, as set forth above, and seeks a permanent injunction preventing

The Hartford from engaging in such conduct in the future.

### COUNT III
**(For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)**

73.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

74.     In the alternative, to the extent that any of the Defendants are not deemed

fiduciaries or co-fiduciaries under ERISA, each of the Defendants is liable to the Class for all

recoverable damages and relief as non-fiduciaries that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment against Defendants, Hartford Life Insurance Company and Neuberger Berman Management, LLC, jointly and severally, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as detailed above;

(b)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Second Amended Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: January 16, 2009                        Respectfully submitted,


                                               /s/ Patrick A. Klingman
                                               James E. Miller
                                               Federal Bar I.D. No. CT-21560
                                               Patrick A. Klingman
                                               Federal Bar I.D. No. CT-17813
                                               Karen M. Leser
                                               Federal Bar I.D. No. CT-23587
                                               Shepherd Finkelman Miller & Shah, LLP
                                               65 Main Street
                                               Chester, CT 06412
                                               Telephone: (860) 526-1100
                                               Facsimile: (860) 526-1120
                                               Email: jmiller@sfmslaw.com
                                                      pklingman@sfmslaw.com
                                                      kleser@sfmslaw.com

                                               Douglas P. Dehler
                                               Shepherd Finkelman Miller & Shah, LLP
                                               111 E. Wisconsin Avenue, Suite 1750
                                               Milwaukee, WI 53202
                                               Telephone:  (414) 226-9900
                                               Facsimile:  (414) 226-9905
                                               Email: ddehler@sfmslaw.com

Ronald S. Kravitz
Matthew B. Borden
Liner Yankelevitz Sunshine & Regenstraif LLP
199 Fremont St., 20th Fl.
San Francisco, California  94105
(415) 489-7700
(415) 489-7701 (facsimile)
Email: rkravitz@linerlaw.com
          mborden@linerlaw.com

Randall J. Sunshine
Robert M. Shore
Liner Yankelevitz Sunshine & Regenstreif, LLP
1100 Glendon Avenue, 14th floor
Los Angeles, California  90024
Telephone:  (310) 500-3500
Facsimile: (310) 500-3501
Email: rsunshine@linerlaw.com
          rshore@linerlaw.com

Steven J. Ross
Law Offices of Steven Ross, P.A.
1015 Atlantic Boulevard  Suite 306
Atlantic Beach, FL  32233
Telephone: (904) 249-8799
Facsimile: (801) 812-8512
Email: stevenjross@msn.com

Attorneys for Plaintiff and the Proposed Class

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 9, 2009, a copy of the foregoing Second Amended Class Action Complaint, dated January 16, 2009, was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                    /s/ Patrick A. Klingman

                    Patrick A. Klingman (ct17813)