IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PHONES PLUS, INC, Plan Administrator of the Phones Plus Retirement Savings Plan, On Behalf of Itself and All Others Similarly Situated, | : : : : : | Case No. 3:06-cv-1835 (AVC) |
| Plaintiff, | : : | |
| vs. | : : | |
| HARTFORD LIFE INSURANCE COMPANY and NEUBERGER BERMAN MANAGEMENT, LLC, | : : : | |
| Defendants. | : | June 8, 2010 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT WITH DEFENDANT HARTFORD LIFE INSURANCE COMPANY**

Plaintiff, Phones Plus, Inc. ("Plaintiff" or "Phones Plus"), pursuant to Federal Rules of Civil Procedure 23(e), 23(h) and 54(d)(2) and this Court's Order dated March 3, 2010 granting preliminary approval of the settlement (the "Settlement") reached with Defendant, Hartford Life Insurance Company ("Hartford Life" or "Defendant"), hereby respectfully submits this Memorandum of Law in Support of Plaintiff's Motion for Final Approval of Settlement with Hartford Life (the "Motion"). Hartford Life does not oppose this Motion. As explained more fully below, the Settlement between Plaintiff and Hartford Life is fair, reasonable and adequate under all the circumstances.[1] For the Court's convenience, a proposed Order of Final Approval

---

[1] The parties' Settlement Agreement was previously submitted to the Court as Exhibit 1 to Plaintiff's Motion for Preliminary Approval of Partial Settlement dated February 11, 2010 (the "Preliminary Approval Motion"). For purposes of convenience and consistency, Plaintiff utilizes the same defined terms adopted in the Preliminary Approval Motion and supporting Memorandum of Law unless otherwise noted.

is attached to the Motion as Exhibit "A."[2]

## I.   INTRODUCTION

This action was brought by Plaintiff on behalf of itself and a proposed Class of thousands of similarly situated administrators of 401(a) and 401(k) retirement plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA") that engaged Hartford Life as a service provider.  Plaintiff challenged certain business practices of Hartford Life and sought to recover revenue sharing payments made to Hartford Life by mutual funds or investment advisors allegedly in violation of the prohibited transaction and fiduciary duty provisions of ERISA.

As the Court is aware, this litigation has been hard-fought for over three years,[3] and the parties have devoted significant resources over that period to presenting their respective views of the complex legal and factual issues implicated by this case.  In this litigation, Hartford Life was represented by Sidley Austin LLP and Jorden Burt LLP, two of the most respected law firms in the United States that defend financial services and insurance companies in ERISA class actions and both of which law firms demonstrated the reason for the reputations that they have earned through their vigorous defense of Hartford Life throughout the pendency of this case.  At the time that the Settlement was reached, it bears noting that Plaintiff's Amended Motion for Class

---

[2]Plaintiff's Motion for Final Approval of this Settlement also is supported by the June 8, 2010 Declaration of Jennifer M. Keough ("Keough Decl."), which is attached as Exhibit "B," the June 8, 2010 Declaration of James E. Miller ("Miller Decl."), which is attached as Exhibit "C," the February 9, 2010 Opinion and Report of Nicholas Saakvitne, Esquire, the Independent Fiduciary ("Opinion and Report of Independent Fiduciary"), which is attached as Exhibit "D," and the February 5, 2010 Declaration of James Scheinberg ("Scheinberg Decl."), which is attached as Exhibit "E."

[3]Indeed, Plaintiff's counsel's investigation related to this matter began over four years ago.

Certification and Hartford Life's Motion for Summary Judgment were pending before the Court with the outcome and, indeed, the viability of Plaintiff's case depending, in large part, upon the outcome of these vigorously contested motions.[4] It also bears noting that, to Plaintiff's knowledge, the Settlement reached in this case is the first of its kind: at least one case against a similar service provider (The Principal)[5] has been dismissed in almost all material respects, and another case against a similar service provider (Nationwide)[6] is on appeal to the Second Circuit Court of Appeals with respect to a decision granting class certification in that case.

      The Settlement terms were arrived at only after three full days of mediation, as well as a number of telephone conferences, with one of the most respected mediators in the United States, Professor Eric D. Green of Boston University School of Law and Resolutions, LLC, which occurred over the course of more than one year. As detailed below, Plaintiff believes that the Settlement reached is an extremely positive one for the Settlement Classes (collectively, the "Class"), with the members of the Class receiving very significant relief relative to the value of their potential claims, especially when the risks of litigation are taken into account. The

---

[4]Pending resolution of those motions, the litigation also had progressed to the point where it was nearly trial ready and, as a result, the parties entered into the Settlement fully apprised of all factual and legal issues that could impact the claims and defenses asserted in the case.

[5]*See Ruppert v. Principal Life Ins. Co.*, No. 4:07-CV-00344-JA-TJS, 2009 WL 5667708 (S.D. Iowa Nov. 5, 2009) (granting defendant's motion for judgment on the pleadings), *reconsideration granted in part*, slip op. (S.D. Iowa March 30, 2010); *see also Ruppert v. Principal Life Ins. Co.*, 252 F.R.D. 488 (S.D. Iowa 2008) (denying class certification in the same case), *reconsideration denied*, slip op. (S.D. Iowa June 8, 2010).

[6]*See Haddock v. Nationwide Financial Services, Inc.*, 262 F.R.D. 97 (D. Conn. 2009)(granting motion for class certification). A petition for review under Fed.R.Civ.P. 23(f) has been filed before the Second Circuit Court of Appeals and oral argument has been held regarding that petition. As of this date, to the best of Plaintiff's knowledge, the Second Circuit Court of Appeals has not ruled on whether it will hear the appeal at this juncture.

members of the Settlement Classes apparently agree with Plaintiff's view of the Settlement. Only a *de minimis* number (19) of Class members have chosen to exclude themselves from the Settlement, and no Class members have filed valid objections to the Settlement. Moreover, Nicholas Saakvitne, Esquire, the Independent Fiduciary engaged to evaluate the fairness of the Settlement on behalf of the Class, agrees that the Settlement should be finally approved since it is fair, reasonable and adequate under all of the circumstances. For this and all of the other reasons discussed below, Plaintiff respectfully submits that the Settlement should receive final approval from the Court.

## II.     THE SETTLEMENT AGREEMENT, DISSEMINATION OF NOTICE AND REACTION OF THE CLASS

The Settlement Agreement is the culmination of over three years of hotly contested litigation. That litigation entailed extensive motion practice, extensive discovery, consultation with experts, the production of expert reports, and a full evaluation of the evidence and governing legal principles. It was arrived at only after arm's-length negotiations that occurred with the assistance of a highly respected mediator over a period of more than a year. These negotiations, which included the formal and informal exchange of factual information and the full and frank discussion of the parties' respective claims and defenses, including the presentation and discussion of complex legal issues, three days of mediation and hard-nosed negotiations by each side, were both lengthy and the subject of vigorous advocacy -- two cornerstones of negotiations that typically will result in a settlement that is well considered and inherently fair and reasonable. That is exactly what the parties were able to achieve in this case.

Through the course of discovery in this action, Plaintiff has received and reviewed

hundreds of thousands of pages of documents, obtained expert reports on liability and damages, consulted with experts regarding the liability of Hartford Life, reviewed and analyzed the expert reports of Hartford Life (and retained the services of an additional expert to support a preclusion motion), deposed numerous fact witnesses over the course of over twenty days, deposed Hartford Life's expert witnesses, defended the depositions of Plaintiff's proposed testifying experts and pursued and obtained third-party discovery.  Thus, the Settlement was reached after considerable investigation and discovery.

Notice of the Settlement, in the form approved by the Court's Preliminary Approval Order, was disseminated to members of the Class by both electronic and first-class mail, using the services of Garden City Group ("GCG"), a highly respected class action settlement administrator.  *See* Keough Decl. at ¶¶ 5, 8.  Members of the Class were informed that they had the right to exclude themselves from the Monetary Relief Class by serving written notice by June 1, 2010.  They were also informed that they had the right to object to the Settlement Agreement by filing and serving a written statement by May 25, 2010.  In response to the Settlement Notice, only nineteen members of the Monetary Relief Class chose to exclude themselves (approximately 0.06% of the total Monetary Relief Class), and no valid objections to the Settlement were filed with the Court.  See Miller Decl. at ¶ 14.[7]  Instead, in recognition of the fairness of the Settlement

---

[7]Two Class members did mail letters to Class Counsel that contained "objections" to the Settlement.  *See* Miller Decl. at ¶ 14.  In one such notice, the Class member excluded itself from the Monetary Relief Class and requested that its objection to being included in the Structural Changes Class be presented to the Court.  *Id*.  But the Court already has upheld the propriety of certifying non-opt-out classes under appropriate circumstances under Fed.R.Civ.P. 23(b)(1) in this case.  Moreover, the objection to inclusion in the Structural Changes Class offers no legal argument but, instead, appears to constitute an objection on philosophical grounds to being included in any class.  *Id*.  The other purported objection, although served on counsel, was not properly filed with the Court.  *Id*.  This second objection challenges the attorneys' fees and

and the significant benefits that it confers, the reaction of the Class has been exceedingly positive. Class Counsel have personally spoken to over one hundred Class members, all of whom have been positive about the Settlement achieved and appreciative of the efforts of Plaintiff and Class Counsel. *See* Miller Decl. at ¶ 13. Over 10,000 Class members have visited the Settlement website maintained by GCG, with over 6,000 Class members already filing the required Instruction Forms. Keough Decl. at ¶ 10, 15-16. The Settlement Administrator also has sent reminder post-cards and emails to all Class members that have not yet submitted a claim (by submitting an Instruction Form under the Settlement) to help ensure that all eligible Class members that wish to participate in the Settlement are able to do so. Keough Decl. at ¶¶ 15-16.

### III.   THE TERMS OF THE SETTLEMENT

As previously described in connection with Plaintiff's Motion for Preliminary Approval of the Settlement, the parties' Settlement provides the following substantial and meaningful relief to the Class:

- Hartford Life will deposit $13,775,000 in a common fund to provide

---

expenses requested by Class Counsel (on the alleged basis that more information regarding the requested fee should have been provided) and generally challenges the class action device (asserting that an earlier opportunity for exclusion should have been offered). *Id.* Plaintiff and Class Counsel consider these assertions to be pure makeweight since (a) this Class member never contacted Plaintiff or Class Counsel to obtain more information regarding the requested fee (which Class Counsel have routinely provided in response to other Class member inquiries) and information regarding the pendency of this case has been publicly available on Class Counsel's website since the inception of this litigation and easily could have been identified by any interested Class member (which, upon occasion, occurred during the pendency of the litigation). *Id*. Although Plaintiff does not believe that either purported "objection" need be considered, since neither was properly filed with the Court and, as a result, both Class members have waived any right to object under the terms of the Court's Preliminary Approval Order, copies of these "objections" are attached as Exhibits "1" and "2" to the Miller Decl. for the Court's convenience. Finally, Plaintiff notes that none of the other requests for exclusion provided any criticism of or objection to the Settlement. *Id*.

compensation to the Monetary Relief Class within fourteen days of the entry of the Final Judgment and Order;

- Hartford Life will pay up to $300,000 for costs of class notice and settlement administration, as well as related costs incurred in connection with the effectuation of the Settlement, for the benefit of both the Monetary Relief Class and the Structural Changes Class;

- Hartford Life will make a number of changes to its business practices that relate directly to Plaintiff's allegations in this case, are squarely directed at addressing the challenged conduct in this case and provide greater clarity in the disclosures with respect to Hartford Life's challenged conduct, all of which will directly benefit the Structural Changes Class:

    - Hartford Life will eliminate the following language from its Qualified Retirement Plan Basic Plan Documents: "Notwithstanding the preceding sentence, the Prototype Sponsor may, as a condition of making the Plan available to the Adopting Employer, limit the types of property in which the assets of the Plan may be invested."  In addition, with respect to any customer that has adopted a Qualified Retirement Plan Basic Plan Document containing this language, Hartford Life has agreed that, as part of this Settlement, it will not enforce this language in any of its Qualified Retirement Plan Basic Plan Documents as a means to restrict a plan's selection of investment options from the Overall Menu.

    - Hartford Life will make the following changes with respect to the language, interpretation and/or enforcement of its Group Annuity Contracts and Group Funding Agreements:

        - Hartford Life agrees that it will not enforce the following sentence in any of its Separate Account Riders without receiving the instruction and consent of a plan: "In addition, The Hartford may periodically invest such assets in short term money market instruments, cash, or cash equivalents."

        - Hartford Life will commence the process of seeking approval from the relevant Departments of Insurance to revise the portion of its Group Annuity Contract and Group Funding Agreement that addresses mutual fund availability to make clear Hartford Life will not delete or substitute an investment option chosen by a plan from the Overall Menu and offered to that plan's participants, unless the investment option is no longer available either (a) due to a change in applicable law or (b) due to a change or event initiated by a

       Fund Company, including, but not limited to, a merger, liquidation or closure. Hartford Life will begin using this new Group Annuity Contract and Group Funding Agreement for customers who purchase such products as soon as practicable after receipt of approvals from the Departments of Insurance. In addition, Hartford Life has agreed that it will not enforce any provision of its Separate Account Rider that is inconsistent with the foregoing revisions.

- All Structural Changes Class Members will be deemed to have directed that all dividends and capital gains distributions payable on the shares of any Fund shall be paid in the form of additional shares of the Fund, and Hartford Life agrees that it will follow such direction. All account opening documents for any Structural Changes Class Member that becomes a customer of Hartford Life after the date that the new Group Annuity Contract and Group Funding Agreement become operative shall disclose that all dividends and capital gains distributions payable on the shares of any Fund are paid in the form of additional shares of that Fund, if available, and an instruction from the customer that all such dividends and capital gains distributions should be received in such form so long as available.

- Hartford Life will include language in its disclosure documents or related materials supplied to new customers, or newly supplied to existing customers, disclosing that all of the mutual fund investment options available on the Overall Menu make Revenue Sharing payments to Hartford Life or an affiliate, so long as such a statement remains true.

- Hartford Life will make available to all current and future Structural Changes Class Members with in-force contracts a list of all investment options offered for the plan's product and the Revenue Sharing rates paid by the relevant Fund Company.

- Starting within a year of the Effective Date, and at least once every twelve months thereafter, Hartford Life will make available to each Structural Changes Class Member that is then a current customer of Hartford Life the following information: (i) the Revenue Sharing rate for the investment options offered by the Class Member to its participants; (ii) the published expense ratio for the investment options offered by the Class Member to its participants; (iii) an estimate of the dollar amount of Revenue Sharing received by Hartford Life in relation to the investments of the Class Member (based on an estimated dollar amount of a plan's account balance

-8-

>in each applicable investment option); (iv) a note explaining how the estimate described above was calculated; (v) a narrative description of Revenue Sharing; and (vi) a listing of the Separate Account fee (in percentage and dollar terms), the annual maintenance fee (in dollar terms), and the per-participant fee (in dollars per participant terms). Hartford Life will notify each such plan by either electronic or first-class mail that this information has been made available and the communication shall describe the information being made available.

Except as described above (when a different time period applies), Hartford Life has agreed that it will begin to implement the changes to its business practices set forth above within sixty days of the Effective Date. Unless otherwise provided in the Settlement Agreement, Hartford Life has agreed that it will make diligent and good faith efforts to ensure that the implementation of these changes is concluded within six months of the Effective Date. In addition, Hartford Life agrees that the above actions will remain in effect for a minimum of five years from the Effective Date of the Settlement Agreement.[8] Moreover, pursuant to the terms of the Settlement Agreement, an opinion and report has been obtained from the Independent Fiduciary,[9] who reviewed and approved all aspects of the Settlement as fair and reasonable under the circumstances.[10]

---

[8] Plaintiff's expert estimates that the information being provided by Hartford Life to the Structural Changes Class has a value of at least $625 per plan per year (with a conservative calculation of $12,187,500 per annum in value based on the number of current plans and the estimate of Plaintiff's expert as to the minimum valuation applicable per plan). *See* Scheinberg Decl. at ¶¶ 17-18. Of course, Hartford Life also will incur additional expenses to make these structural and related changes.

[9] This opinion is being provided, to the extent applicable, in order to comply with the DOL's Prohibited Transaction Exemption ("PTE") No. 2003-39.

[10] Any uncashed checks sent to members of the Monetary Relief Class will be distributed to an appropriate charity pursuant to a *cy pres* award approved by the Court. As reflected in the proposed Final Approval Order accompanying this Motion, the parties suggest that they make an application to *cy pres* any such funds, along with any funds that could not be distributed as a

Hartford Life vigorously denies all allegations of wrongdoing in this case, and is settling without admitting liability. As the Settlement Agreement recites, Hartford Life has chosen to settle to "avoid the uncertainties and halt the substantial expense, business disruption, and burden inherent in continued litigation." Settlement Agreement, at 3.

## IV.     THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT

By the Preliminary Approval Order, this Court has certified the Settlement Classes pursuant to Federal Rule of Civil Procedure 23(b)(1) and 23(b)(3). As directed by the Preliminary Approval Order, Class Notice has been disseminated, by electronic and first-class mail, directly to members of the Class, and notice of the Settlement also has been published in *The Wall Street Journal*. Accordingly, this Court may now finally approve the Settlement if it concludes that the Settlement merits such approval.

### A.     Standard for Final Approval of Settlement Agreement

Pursuant to Federal Rule of Civil Procedure 23(e), a class action cannot be finally settled without the approval of this Court. The standard for final approval of a class action settlement in this Circuit is clear: this Court must determine, through the exercise of its discretion, whether the proposed settlement is "fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (*citing Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir.2000)); *In re Priceline.com, Inc. Sec. Litig.*, No. 3:00-CV-1884 (AVC), 2007 WL 2115592, at *2 (D. Conn. July 20, 2007) (same). The Court's discretion is guided by several general policies, including the "strong judicial policy in favor of settlements,

---

result of the prior partial settlement with Defendant, Neuberger Berman, LLC, 180 days after the entry of the Final Approval Order, which will provide the parties with sufficient time to determine if any such funds need to be so distributed and to agree on an appropriate charity.

particularly in the class action context." *Wal-Mart Stores*, 396 F.3d at 116 (*citing In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir.1998)); *see Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation") (citations omitted); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:41, at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy"). In addition, a "presumption of fairness, adequacy, and reasonableness" attaches to a class action settlement where it is "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*, 396 F.3d at 116 (*citing Manual for Complex Litigation, Third,* § 30.42 (1995)); *In re Priceline.com*, 2007 WL 2115592, at *2 (same).

The Court's discretion in granting final approval of a class action settlement is also informed by the nine factors initially set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000): (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Grinnell Corp.*, 495 F.2d at 463. However, "[i]n finding that a settlement is fair, not every factor must weigh in favor of

settlement, [and] 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)). An examination of the totality of these factors, as discussed further below, supports final approval of the Settlement.

**B.     The Settlement Is Presumptively Fair, Adequate And Reasonable**

As detailed above, there can be no question that this Settlement was reached as a result of arm's-length negotiations between experienced and capable counsel after meaningful discovery. Therefore, under *Wal-Mart Stores*, 396 F.3d at 116, the Settlement should be adjudged presumptively fair, adequate and reasonable. Nothing in the record provides any basis to disturb or question that presumption. Accordingly, the procedural means through which the Settlement was achieved alone creates a presumption in favor of final approval and strongly weighs in favor of the Court granting such approval.

**C.     The *Grinnell* Factors Support Approval**

Review of the *Grinnell* factors also strongly supports final approval. First, as the Court is aware from the record and docket activity in this litigation, the case was extremely complex and expensive, with at least several additional years likely remaining in duration, including appeals following any class certification or trial, before the case could be finally concluded. *See*, *e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("class actions have a well deserved reputation as being most complex") (citation and internal quotations omitted); *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993) (ERISA is "an enormously complex and detailed statute"); *see Amara v. Cigna Corp.*, 534 F.Supp.2d 288, 296 (D. Conn.

2008) (describing ERISA and implementing regulations as "often lamentably obscure").

Second, as discussed above, the reaction of the Class to the Settlement has been almost universally positive. *See*, *e.g.*, *Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y. 2002) (reaction of the class to a settlement agreement "is perhaps the most significant factor to be weighed in considering its adequacy"); *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997) ("A favorable reception by the Class constitutes 'strong evidence' of the fairness of a proposed settlement and ... the absence of [objections] may itself be taken as evidencing the fairness of a settlement") (citations and internal quotations omitted).[11]

Third, the parties had conducted extensive discovery and completed virtually all pretrial work before the Settlement was reached.

Fourth, as reflected in Defendant's Motion for Summary Judgment and the result in *Ruppert v. Principal Life Insurance Co.* (discussed above), at a minimum, there was a risk of establishing liability.

Fifth, although Plaintiff disagreed with the position, a risk certainly existed with respect to establishing damages, since one of Defendant's experts, Dr. Craig Merrill, offered an extensive expert opinion that Plaintiff and the Class had suffered no damages.

Sixth, the risks of maintaining the class action through the trial are established by the fact that no class had been certified at the time of Settlement, class certification was denied in *Ruppert v. Principal Life Insurance Co.* and even the certification of the class in *Haddock v. Nationwide Insurance* is now subject to an interlocutory appeal pursuant to Rule 23(f) before the

---

[11]Only two Class members voiced any objection of any kind, which is less than .01% of the Class.

Second Circuit Court of Appeals.

Seventh, although Hartford Life certainly has the ability to withstand a greater judgment than the Settlement entails, it bears noting that, during the pendency of the litigation and certain of these negotiations, the United States experienced the greatest financial crisis since the Great Depression.

Eighth, the value of the Settlement, as acknowledged by the Independent Fiduciary, compares quite favorably to the maximum recovery when measured by the parties' respective experts in terms of the profits Hartford Life earned from revenue sharing payments during the Class Period. *See* Opinion and Report of Independent Fiduciary at 7.

Ninth and finally, the Settlement is clearly reasonable and a very positive result for the Class when measured against the possible recovery in light of all the attendant risks of litigation. *Id.*

### D. The Court Should Approve the Attorneys' Fee and Expense Request, As Well As The Requested Case Contribution Fee

Plaintiff requests that the Court award attorneys' fees and costs in the amount of $6,862,500 (an amount that equates to a small percentage of the total Settlement value)[12] and is less than Class Counsel's total lodestar devoted to this matter (*i.e.*, the costs and fees, based on Class Counsel's normal hourly rates, expended in prosecuting this case for over the past three

---

[12]Based upon the conservative valuation of the Settlement by Plaintiff's expert, Mr. Scheinberg, *see* Scheinberg Decl. at 19, the requested fee and expense award amounts to only slightly more than 9% of the total value of the Settlement [*i.e.*, (($12,187,500 x 5) + $13,775,000 + $300,000)/$6,862,500), and the fee request amounts to less than 24% of the value of the Settlement in its first year alone [($12,187,500 + $13,775,000 + $300,000/($6,862,500-$661,160.55))].

years),[13] which Plaintiff believes is fair and reasonable under applicable law. *See, e.g., Goldberger*, 209 F.3d at 50 ("The question of whether a particular fee is reasonable must be guided by consideration of such factors as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy"); *see also Wal-Mart Stores*, 396 F.3d at 122 ("Consistent with these guidelines, a reasonable attorneys' fee may be calculated using either the percentage method or the lodestar method, though the recent trend in this Circuit has been to use the percentage method"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3rd Cir. 2005) (awarding 25% of value of settlement and multiplier of 4.5 to 8.5).

The Settlement also provides for the payment of a Case Contribution Fee to Plaintiff in the amount of $25,000 in recognition of its invaluable contributions to the prosecution of this action. Such awards are commonplace in class actions, especially where, as here, a Plaintiff has made significant contributions to the Settlement, and are intended "to compensate the named plaintiff for any personal risk incurred ... or any additional effort expended by the [named plaintiff] for the benefit of the lawsuit." *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001) (citation omitted); *see, e.g., In re Publication Paper Antitrust Litig.*, No. 3:04-MD-1631 (SRU), 2009 WL 2351724, at *1 (D. Conn. July 30, 2009) (same); *Fears v.*

---

[13]Based upon the lodestar of Class Counsel to date in the case, the requested fee and expense award results in Class Counsel receiving approximately 85% of their collective lodestar, all of which, along with a recitation of counsel's experience, is detailed in the Declaration of James E. Miller accompanying this Memorandum. *See* Miller Decl. at ¶¶ 18, 26, 28. Although Class Counsel respectfully believe that the result obtained justifies a substantial multiplier on their time, they have agreed for purposes of the Settlement to limit the fee and expense request to the amount sought and also have agreed that they would not accept any more than the amount sought. Pursuant to the terms of the Settlement, Hartford Life takes no position regarding an award of fees and expenses up to the amount requested.

*Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (HB), 2005 WL 1041134, at *3 (S.D.N.Y. May 5, 2005) (same; approving "incentive awards" of $25,000 for each named plaintiff who was deposed and $15,000 for each class representative), *vacated and remanded on other grounds*, *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007); *RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL), 2003 WL 21136726, at *2 (S.D.N.Y. May 15, 2003) (same; approving $25,000 "incentive award" to named plaintiff in recognition of its intimate involvement in the litigation). Here, Plaintiff was intimately involved in prosecuting the subject litigation and also was forced to defend against counterclaims (with third party claims being asserted against its principals), all as a result of its prosecution of this case. *See* Miller Decl. at ¶ 29. Under the circumstances, Plaintiff respectfully submits that the requested Case Contribution Fee is reasonable and fair, and should be approved. Furthermore, the amount and nature of the Case Contribution Fee was explicitly stated in the Notice and there have been no objections to it.

        **E.    The Reaction Of The Federal And State Attorneys General And State Insurance Commissioners Also Supports Final Approval Of The Settlement**

Consistent with the requirements of the Class Action Fairness Act, Hartford Life provided notice of the Settlement to (a) the Attorney General of the United States, (b) the Attorneys General of each State, and © the Insurance Commissioners of each State. In recognition of the inherent fairness of the Settlement, none of these government regulators have objected in any respect to the Settlement or raised any concern with respect to the fairness of the Settlement. The reaction of these federal and state government regulators, like that of the Class, speaks volumes as to the fairness of the Settlement and the propriety of this Court granting final

approval to the Settlement.

**V.    CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court (a) grant Plaintiff's unopposed Motion for Final Approval of Settlement with Defendant, Hartford Life Insurance Company, and (b) enter the accompanying proposed Final Approval Order.

Respectfully submitted,

/s/ Patrick A. Klingman
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen M. Leser (ct23587)
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
         pklingman@sfmslaw.com
         kleser@sfmslaw.com

Douglas P. Dehler
Shepherd Finkelman Miller & Shah, LLP
111 E. Wisconsin Avenue, Suite 1750
Milwaukee, WI 53202
Telephone:  (414) 226-9900
Facsimile:  (414) 226-9905
Email: ddehler@sfmslaw.com

Ronald S. Kravitz
Liner Grode Stein Yankelevitz Sunshine
 Regenstreif & Taylor LLP
199 Fremont St., 20th Fl.
San Francisco, CA  94105
(415) 489-7700
(415) 489-7701 (facsimile)
Email: rkravitz@linerlaw.com

Randall J. Sunshine
Robert M. Shore
Liner Grode Stein Yankelevitz Sunshine
 Regenstreif & Taylor LLP
1100 Glendon Avenue, 14th floor
Los Angeles, CA  90024
Telephone:  (310) 500-3500
Facsimile: (310) 500-3501
Email: rsunshine@linerlaw.com
          rshore@linerlaw.com

Steven J. Ross
Law Offices of Steven Ross, P.A.
1015 Atlantic Boulevard  Suite 306
Atlantic Beach, FL  32233
Telephone: (904) 249-8799
Facsimile: (801) 812-8512
Email: stevenjross@msn.com

Attorneys for Plaintiff
and the Proposed Settlement Classes